# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### June 4, 2010 Session

## DON NICHOLS v. JACK COOPER TRANSPORT COMPANY, INC. ET AL.

**Appeal by Permission from the Special Workers' Compensation Appeals Panel**
**Chancery Court for Rutherford County**
**No. 55486 & 07-00007WC      Robert E. Corlew, Chancellor**

---

**No. M2008-00204-SC-WCM-WC & M2008-00205-SC-WCM-WC**
**\* Filed August 27, 2010 \***

---

The employee, who suffered two separate injuries during the course of his employment as a truck driver for the employer, settled his first claim for workers' compensation and filed suit on the second. Shortly after being laid off because of an unexpected work shortage, the employee elected to retire in order to maintain medical insurance coverage rather than face an indefinite furlough without pay or benefits coverage. When the trial court reconsidered the settlement and awarded benefits in excess of the lower statutory cap on the second claim, resolving the issues in favor of the employee, the employer appealed, and the Special Workers' Compensation Appeals Panel reversed. Because we have concluded that the employment relationship terminated when the employee was laid off, rather than when he subsequently retired, the employee was not meaningfully returned to work, and, therefore, qualifies for reconsideration of his first injury and is not subject to the lower cap on the second. The judgment of the Panel is reversed, and that of the trial court is reinstated.

**Tenn. Code Ann. § 50-6-225(e) Appeal as of Right; Judgment of the Panel Reversed;**
**Judgment of the Chancery Court Reinstated**

GARY R. WADE, J., delivered the opinion of the Court, in which JANICE M. HOLDER, C.J., CORNELIA A. CLARK, and SHARON G. LEE, JJ., joined. WILLIAM C. KOCH, JR., J., not participating.

Larry R. McElhaney and J. Nicholas Harris, Nashville, Tennessee, for the appellee, Don Nichols.

Richard C. Mangelsdorf, Jr. and J. Paul Brewer, Nashville, Tennessee, for the appellants, Jack Cooper Transport, Inc. and Liberty Mutual Insurance.

## OPINION

### Facts and Procedural History

Don Nichols (the "Employee"), who was 57 years old at the time of trial, joined the Teamsters Union in 1969 and worked as a truck driver for most of his career. In 2000, he was employed by Jack Cooper Transport, Inc. (the "Employer"), which is involved in the automotive transportation business operating terminals at seventeen locations nationwide. The Employee hauled newly manufactured automobiles from the Employer's Murfreesboro terminal to a variety of other sites, a physically and mentally demanding job according to testimony offered at trial. His duties included loading the cars onto his truck, securing them in place, and transporting them over long distances. By 2007, the Employee ranked in seniority near the middle of the list of drivers employed at the Murfreesboro terminal. Under the collective bargaining agreement ("CBA") between the Employer and the Teamsters Union, the Employee maintained the same level of seniority during any layoffs, so long as the period of time off did not exceed seven years.

The business at the Employer's Murfreesboro terminal depended entirely upon the manufacture of automobiles at Saturn Corporation's plant in Spring Hill and the Nissan Motor Manufacturing Corporation's plant in Smyrna. For that reason, the Employer had a history of temporary layoffs for many of its drivers, including the Employee, during biannual shutdowns at the two plants. Drivers were regularly laid off for one to two weeks in July of each year and often experienced layoffs for the same length of time during the Christmas/New Year's holidays. Both layoffs and recalls were based on seniority; those with the least seniority were laid off first and recalled last. During these periods of furlough, the drivers did not qualify for pay or health insurance benefits from the Employer and were eligible to apply for unemployment insurance benefits from the state. While drivers who were recalled to work were paid the same wage as they previously had earned, they typically had to wait approximately one month to qualify for health insurance. The Employer provided no assurances to its drivers as to when or if they would be recalled. According to David Wayne Barnes, the manager of the Murfreesboro terminal, the length of the seasonal layoffs had varied over the years, but the drivers had always been recalled.

During furloughs at the Murfreesboro terminal, drivers were given the opportunity to work temporarily out of other terminals owned by the Employer. The terms of the CBA provided that if a driver worked at another terminal during a layoff, the driver would maintain seniority at Murfreesboro, but the seniority would not transfer to the new location. That is, the driver would be last on the seniority list at any terminal other than in Murfreesboro. This, in turn, could affect the routes the driver would be assigned at his temporary locale.

During the seven years of employment with the Employer, the Employee suffered two compensable injuries. In July of 2004, the Employee injured his neck when his truck unexpectedly struck a series of humps on an interstate in Texas, a phenomenon known to truck drivers as "whoop-de-do's." The impact caused the Employee's seat to suddenly jerk downward and then return to its original position while his seatbelt remained locked in place. The Employee received treatment for about a year and eventually settled a workers' compensation claim based upon an award of 5.5% permanent partial disability benefits to the body as a whole. In August of 2005, after having returned to work for only a few weeks, the Employee, who had no medical restrictions as a result of his neck injury, suffered an injury to his shoulder while moving vehicles on and off his truck. The shoulder injury required surgery, and the Employee was assigned a permanent impairment rating of 6% by his treating physician and 10% by an evaluating physician, for which he also sought workers' compensation benefits.

In June of 2006, the Employee returned to work, again with no medical restrictions. Despite the infirmity caused by his injuries, the Employee continued to meet all of the demands of his employment. His earnings did not change. The Employee, who had no plans to retire, had arranged a vacation from his employment for September of 2007; however, in early April of 2007, Saturn's parent company, General Motors, halted operations in Spring Hill for the plant to retool and for a modification of its lines. Because the Spring Hill plant provided 50-55% of the Employer's business at the Murfreesboro terminal, the Employer responded to the shutdown with a significant layoff that affected about half of the drivers, including the Employee. A number of other drivers whose seniority had protected them from prior seasonal layoffs were also affected. The indefinite shutdown at the Spring Hill plant was without precedent, and the Employer could not predict the length of time the drivers would be without work in Murfreesboro. Because of the reason given for the layoff, the time of year during which it occurred, and the number of drivers it affected, the terminal manager Wayne Barnes described the April 2007 layoff as "totally different" from the "normal every year, come to the summertime, going to lay a couple people off layoff." The Employer provided no pay or benefits to its drivers during this period and encouraged them to take temporary jobs.

When, on April 27, 2007, the Employee was laid off as a result of the retooling at the Spring Hill plant, he informed the Employer that he would be willing to accept temporary employment at other terminals. In the following weeks, however, when the Employer offered him work at terminals in Lansing, Michigan, San Antonio, Texas, and Muncie, Indiana, the Employee declined. When asked why, he said

[w]ell, basically, [I would] more or less keep[] up two families. You're having to live. You're paying your own motel, plus your expenses, and most of the

time the trips [are] not that good. You get the trash [jobs]. Usually you're at the bottom of the board at all those terminals, and at the ones that they w[ere] discussing at that time I believe . . . w[ere] railheads, so that's locally 50-mile, 100-mile radius of the railhead. So, no, it would not be worth my deal to even drive up there, let alone go to work.

The Employee reiterated that when he had worked at a railhead in the past, his "expenses outweighed what [he] made considerably." When pressed on cross-examination, the Employee admitted that he would have been paid the same rate for working out of the Lansing terminal, but he declined the offer because he did not "really care . . . about going up" to "Yankee land." The Employee testified that he considered himself to be employed by the Employer during the periods he was laid off.

On May 31, 2007, after having been without work for over a month and still without any knowledge of when or if he might be recalled, the Employee notified the Teamsters Union of his intent to retire. While it is undisputed that his retirement decision was unrelated to his neck and shoulder injuries, the Employee explained that he and his wife, Nancy, needed health insurance benefits to cover the cost of their prescribed medications. The Employee testified that if he had been "called back to work in a couple of weeks or two," he would have returned to his job. Because he had no health insurance, however, and the date of his recall from the layoff was uncertain, the Employee decided to retire. Afterward, the Employee sought reconsideration of the settlement amount for his neck injury on the theory that he had not made a meaningful return to work. The request for reconsideration was consolidated with his pending claim for his shoulder injury.

At trial, Barnes, testifying for the Employer, stated that if the Employee had not retired, he would have been recalled to work, based upon his seniority, on June 11, 2007; he conceded, however, that the Employee would have been laid off again in late June for a couple of weeks, recalled in July, and finally laid off a third time in August. Barnes also acknowledged that because the Spring Hill plant had not reopened, the Murfreesboro terminal still was not operating at full capacity. Barnes was unable to determine whether the drivers who had been laid off would eventually be recalled.

At the conclusion of the hearing, the trial court held that because the Employee was laid off in April of 2007, he was not returned to work by the Employer at a wage equal or greater to his pre-injury wage and, therefore, was neither precluded from seeking reconsideration of the settlement for his neck injury, see Tenn. Code Ann. § 50-6-241(d)(1)(B) (2008 & Supp. 2009), nor subject to the benefits cap of 1.5 times the impairment rating for his shoulder injury, see Tenn. Code Ann. § 50-6-241(d)(1)(A). After considering each of the two claims, the trial court awarded an additional 5.5% disability to

the body as a whole for the first injury and found a 7% impairment rating to the body as a whole for the second, using a multiplier of three to calculate the vocational disability.

The Employer appealed, claiming that the term of employment had ended because of voluntary retirement, rather than the layoff, thereby prohibiting the Employee from seeking reconsideration of the award for the 2004 neck injury and subjecting him to the lower statutory cap on benefits for the 2005 shoulder injury. The Special Workers' Compensation Appeals Panel reversed the holding of the trial court. Engaging in the fact-intensive inquiry required by Tryon v. Saturn Corp., 254 S.W.3d 321 (Tenn. 2008), the Panel held that the Employee voluntarily retired at a time he was still employed by the Employer because (1) layoffs without pay or benefits were expected, rather than exceptional, events at the Employer; (2) the Employee considered himself employed during the layoff periods; (3) the Employee rejected the option to accept temporary positions during the 2007 layoff; and (4) the Employee would have been recalled within two weeks had he not left. The Panel, therefore, declined reconsideration of the neck injury and applied the minimum multiplier of 1.5 to the award for the shoulder injury. We granted full court review to consider the important and timely question of whether the layoff of the Employee constituted a "loss of employment" under our workers' compensation law.

**Standard of Review**

We review the trial court's findings of fact "de novo upon the record . . . accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. Code Ann. § 50-6-225(e)(2) (2008). "This standard of review requires us to examine, in depth, a trial court's factual findings and conclusions." Crew v. First Source Furniture Group, 259 S.W.3d 656, 664 (Tenn. 2008) (quoting Galloway v. Memphis Drum Serv., 822 S.W.2d 584, 586 (Tenn. 1991)). We review questions of law, however, de novo with no presumption of correctness. Perrin v. Gaylord Entm't Co., 120 S.W.3d 823, 826 (Tenn. 2003). The interpretation and application of our workers' compensation statutes are questions of law. See Seiber v. Reeves Logging, 284 S.W.3d 294, 298 (Tenn. 2009). Our primary objective when engaging in statutory construction is to carry out the intent of the legislature without unduly broadening or restricting the statute. Arias v. Duro Standard Prods. Co., 303 S.W.3d 256, 260 (Tenn. 2010).

**Applicable Law**

This case provides us with the unique opportunity to consider two provisions of our workers' compensation statute with a shared history – the cap on permanent partial disability benefits and the subsection permitting reconsideration of a prior benefits award. In 1919, the first workers' compensation laws in Tennessee were enacted with the purpose of relieving society of the burden of compensating injured workers and placing that responsibility on employers. Lynch v. City of Jellico, 205 S.W.3d 384, 390 (Tenn. 2006); Scott v. Nashville

Bridge Co., 223 S.W. 844, 849 (Tenn. 1920). Because of their remedial nature, Tenn. Code Ann. § 50-6-116 (2008), this Court has traditionally construed workers' compensation statutes in a liberal manner in order "to promote and adhere to the Act's purposes of securing benefits to those workers who fall within its coverage." Trosper v. Armstrong Wood Prods., Inc., 273 S.W.3d 598, 609 n.5 (Tenn. 2008) (quoting Martin v. Lear Corp., 90 S.W.3d 626, 629 (Tenn. 2002)). From time to time, however, the legislature has seen fit to limit the recovery to which employees are entitled under the Act. In 1992, for example, the legislature instituted a cap on permanent partial disability benefits of 2.5 times the medical impairment rating for eligible employees who are returned to their employment at a wage equal to or greater than the wage they were receiving at the time of their injury. Workers' Compensation Reform Act of 1992, ch. 900, § 16, 1992 Tenn. Pub. Acts 859, 870 (codified at Tenn. Code Ann. § 50-6-241(a)(1) (1999)). The 1992 Act also added a provision entitling an employee to reconsideration of a disability award "where the employee is no longer employed by the pre-injury employer and makes application to the appropriate court within one (1) year of the employee's loss of employment if such loss of employment is within four hundred (400) weeks of the day the employee returned to work." Id. at 870-71 (codified at Tenn. Code Ann. § 50-6-241(a)(2)). The Act lists several factors to be considered in the reconsideration process, "including lay and expert testimony, employee's age, education, skills and training, local job opportunities, and capacity to work at types of employment available in claimant's disabled condition." Id. at 870.

In 2004, the General Assembly passed a sweeping overhaul of the workers' compensation statutes, Act of May 20, 2004, ch. 962, 2004 Tenn. Pub. Acts 2346, with the purpose of reducing the Employer's costs for workers' compensation. Lynch, 205 S.W.3d at 390. Specifically,

> the legislature recognized that "significant cost savings will result" to employers, and that "[i]t is in the best interest of the citizens of Tennessee that such cost savings be passed to the entities that have paid faithfully workers' compensation premiums in order to ensure the economic well-being of their employees."

Id. (quoting Act of May 20, 2004, ch. 962, § 42(a), 2004 Tenn. Pub. Acts 2346, 2372). The 2004 Act included amendments to both the benefits cap and reconsideration provisions for injuries occurring after July 1, 2004. Act of May 20, 2004, ch. 962, § 11, 2004 Tenn. Pub. Acts 2346, 2350-53. Significantly, the Act reduced the cap on permanent partial disability benefits to 1.5 times the impairment rating when the employee has returned to his place of

employment at the same or a greater wage.[1] Id. at 2351 (codified at Tenn. Code Ann. § 50-6-241(d)(1)(A) (2008 & Supp. 2009)).  Moreover, the 2004 amendments placed specific limitations on a request for reconsideration, providing that

> under no circumstances shall an employee be entitled to reconsideration when the loss of employment is due to either:
>
> *(a)* the employee's voluntary resignation or retirement, provided such resignation or retirement does not result from the work-related disability which is the subject of such reconsideration; or
>
> *(b)* the employee's misconduct connected with his employment.

Id. at 2352 (codified as amended at Tenn. Code Ann. § 50-6-241(d)(1)(B)(iii)).[2]

Our courts have applied a similar analysis to interpret and apply the benefits cap and reconsideration provisions.  The "meaningful return to work" concept provides guidance in the determination of whether the statutory provisions apply to a claim.  In Tryon, this Court made the following observation:

> When determining whether a particular employee had a meaningful return to work, the courts must assess the reasonableness of the employer in attempting to return the employee to work and the reasonableness of the employee in failing to either return to or remain at work.  The determination of the reasonableness of the actions of the employer and the employee depends on the facts of each case.

---

[1] The cap on permanent partial disability benefits for an injured employee who is not returned to work by the employer at a wage equal or greater to her pre-injury wage is six times the impairment rating. Tenn. Code Ann. § 50-6-241(d)(2)(A).  This figure remained unchanged as a result of the 2004 amendments to the workers' compensation laws.

[2] The reconsideration provisions were even more recently amended to provide that

> [e]mployees who continue in their employment after a reduction in pay or a reduction in hours due to economic conditions shall not be entitled to reconsideration of their claims under this section if the reduction in pay or reduction in hours affected at least fifty (50%) of all hourly employees operating at or out of the same location.

Act of June 11, 2010, ch. 1034, § 1, 2010 Tenn. Pub. Acts ___, ___.  This amendment, which only affects "reconsideration of claims approved or adjudicated on or after July 1, 2010," id. at § 3, "does not apply to or include employees involved in layoffs, closures or a termination of business operations," id. at § 2.

254 S.W.3d at 328 (citations omitted). We concluded that "the same standard should be applied to determine whether an employee had a meaningful return to work as part of an initial assessment as in a reconsideration case." Id. at 333 n.25; see also Lay v. Scott County Sheriff's Dep't, 109 S.W.3d 293, 298 (Tenn. 2003).

With regard to the cap on benefits, "[i]f . . . the employee . . . retires or resigns for personal reasons or other reasons that are not reasonably related to his or her workplace injury, the employee has had a meaningful return to work which triggers the" lower cap. Tryon, 254 S.W.3d at 329. When the employee has made a meaningful return to work, the lower cap of 1.5 times the impairment rating (for injuries occurring after July 1, 2004) or 2.5 times the impairment rating (for injuries prior to that date) applies. If, however, an employee has not made a meaningful return to work, six times the impairment rating is the ceiling on the award of benefits. See id. at 328; Nelson v. Wal-Mart Stores, Inc., 8 S.W.3d 625, 629-30 (Tenn. 1999); see also Lay, 109 S.W.3d at 297.[3]

As to the reconsideration provision, the phrases "loss of employment" and "no longer employed by the pre-injury employer" are left undefined in the statute, but must be read harmoniously with one another. Perrin, 120 S.W.3d at 827. The limitations enumerated in the statute are the only restrictions on reconsideration for an erstwhile employee. For example, a workers' compensation claimant need not prove that the loss of employment was related to the workplace injury to be eligible for reconsideration. Niziol v. Lockheed Martin Energy Sys., Inc., 8 S.W.3d 622, 624 (Tenn. 1999). Further, a worker does not forfeit his right to reconsideration of a prior award if he suffers a subsequent work-related injury for which he also seeks compensation. Clark v. Lowe's Home Ctrs., 201 S.W.3d 647, 650-51 (Tenn. 2006). Finally, and most significantly in this instance, reconsideration is permitted even when the employee has resigned in the interim, so long as that resignation is not voluntary or is related to his or her workplace injury. Tenn. Code Ann. §

---

[3] A "meaningful return to work" requires an employee not only to return to employment, but also to receive "a wage equal to or greater than the wage that they were receiving at the time of the injury." Tenn. Code Ann. § 50-6-241(d)(1)(A). Thus, an employee could be free from the restrictions of section 50-6-241(d)(1)(A) even if she is still working for the employer, so long as she is making less than she was receiving before her injury. See, e.g., Patton v. Hartco Flooring Co., No. E2008-01829-WC-R3-WC, 2009 WL 3170391, at *6-7 (Tenn. Workers' Comp. Panel Oct. 1, 2009) (holding that there was not a meaningful return to work when the employee transferred to a position that paid seventy cents less per hour and the transfer was directly related to her workplace injury). In contrast, the reconsideration provision applies only where the employee is "no longer employed by the pre-injury employer," Tenn. Code Ann. § 50-6-241(d)(1)(B)(i), and where the "loss of employment" was not due to one of the conditions set forth in section 50-6-241(d)(1)(B)(iii).

50-6-241(d)(1)(B)(iii)(*a*); Hardin v. Royal & Sunalliance Ins., 104 S.W.3d 501, 505-06 (Tenn. 2003).[4]

Because, in this case, the Employee is no longer working for the Employer, the standard for determining the applicability of the cap and the reconsideration of the initial award is identical. Initially, the Employee voluntarily retired. Moreover, because his retirement was unrelated to the work-related injuries to his neck and shoulder, he ordinarily would be precluded from seeking a reconsideration of the award for his neck injury and subject to the lower cap on his shoulder injury. The Employee, however, was laid off on April 27, 2007. If that qualifies as a "loss of employment" that preceded the voluntary retirement, then the Employee did not make a meaningful return to work, may seek reconsideration of his initial injury, and is not subject to the lower benefits cap on his pending second claim. The disposition of each claim turns on whether the layoff terminated the employment relationship prior to the date of the Employee's retirement.

**Analysis**

The question of whether a layoff constitutes a loss of employment under our workers' compensation statutes is one of first impression. The full Court has considered the impact of temporary layoffs once before, but in a different context: whether Tennessee or Virginia workers' compensation law should apply based upon the location of the claimant's "contract for hire." See Hale v. Fraley's Inc., 825 S.W.2d 690, 691 (Tenn. 1992). In Hale, we held that a temporary layoff did not terminate the employment relationship based upon testimony "that temporary layoffs [were] common in the construction industry and that a laid off employee is not considered to have been dismissed," and for the further reason that "the parties behaved as though there had been no significant break in [the employee's] service." Id.[5]

---

[4] In Hardin, this Court also held

> that while a trial court may reconsider a previous award if the employee resigns, it may increase that award only if the resignation was reasonably related to the injury. For example, the resignation may be due to the employee's inability to perform the work or the employer's refusal to accommodate the worker's medical restrictions.

104 S.W.3d at 505-06 (emphasis added). The 2004 amendments to the workers' compensation statute, which occurred a year after the decision in Hardin, indicate that a resignation or retirement that is both voluntary and unrelated to the workplace injury precludes reconsideration. If the resignation or retirement is involuntary, however, reconsideration may still be available, even if it is unrelated to the injury. Whether to grant a supplemental award depends on the facts of each case.

[5] Courts in other jurisdictions have considered the effect of an employee's retirement during a period

(continued...)

Our Special Workers' Compensation Appeals Panel has written extensively on the effect of layoffs on the meaningful return to work analysis. In Haney v. Five Rivers Electronic Innovation, LLC, No. E2004-01941-WC-R3-CV, 2006 WL 2423430 (Tenn. Workers' Comp. Panel Aug. 23, 2006), the employee suffered a work-related injury, was laid off during his recovery, returned to work after the layoff, and then was laid off a second time. Id. at *1. After the second layoff, he accepted a job with another employer. Id. When Five Rivers offered to recall Haney to his former job six months later, he declined the offer. Id. at *4. The Panel in Haney equated the layoff with termination of the employment relationship, holding that "when the employer returns the employee to work, but then terminates the employee, due to no fault of the employee, with no assurance that he will be re-employed in the future," the employee has not had a meaningful return to work. Id. at *5. In a lengthy opinion, the trial court in this case relied upon Haney to hold that

> [f]or purposes of [section] 50-6-241 . . . a lay-off, no matter how long and no matter whether the custom in the industry calls for laid off employees generally to be called back, allows an Employee who is laid off to be justified in seeking other employment, or in terminating his relationship with the pre-injury employer. When he does so, he is no longer bound by the limitations of one and one-half times the anatomical impairment rating . . . .

On appeal by the Employer, the Panel distinguished Haney, observing that, unlike the Employee in this case, Haney "did not return to his pre-injury position within the company" and "resigned because his pre-injury employer could not provide him with a position compatible with his injury and in the meantime he had found another job that was." The Panel instead relied upon Edwards v. Saturn Corp., No. M2007-01955-WC-R3-WC, 2008 WL 4378188 (Tenn. Workers' Comp. Panel Sept. 25, 2008). In Edwards, litigation also arising out of the April 2007 shutdown of the Spring Hill plant, the employee filed a claim for workers' compensation in March 2006 but continued to work at Saturn until the layoff. Id. at *2. Throughout the term of the layoff, Edwards considered himself employed and received 95% of his pre-layoff wage and all of his health care, life insurance, and other benefits. Id. at *2, 6. Under these circumstances, the Panel in Edwards ruled that "[a]part from the fact that Mr. Edwards was not physically going to work every day, every other fact in the [Edwards] record suggests that [he] was an employee . . . during his lay-off period."

_____

[5](...continued)
of layoff with regard to that employee's ability to obtain state unemployment insurance benefits. Compare Phelps Dodge Corp. v. State Dep't of Econ. Sec., 609 P.2d 612, 615 (Ariz. Ct. App. 1980) (holding that the employment relationship was terminated not by the layoff but by the employee's "own act in choosing to accept retirement") with Reserve Mining Co. v. Cooke, 372 N.W.2d 796, 798 (Minn. Ct. App. 1985) (holding that the employee's retirement subsequent to his being laid off "did not disqualify him from receiving unemployment benefits").

Id. at *6. In drawing this conclusion, "the Panel place[d] great emphasis on the specific terms of the contract between the [union] and [the employer] that allowed Mr. Edwards to continue to receive almost the exact same benefits and compensation that he was receiving prior to his lay-off." Id. at *7. In other words, "the terms of th[e] collective bargaining agreement . . . constitute[d] the functional equivalent of continued employment." Id. at *8.

In a third opinion, Wheeler v. Whirlpool Corp., No. M2009-00206-WC-R3-WC, 2010 WL 366672, at *5-6 (Tenn. Workers' Comp. Panel Feb. 3, 2010), the employee, who chose to be laid off rather than transfer to another position when hers was abolished, was determined not to have either resigned or retired. The Wheeler Panel observed that the employee "anticipated the availability of being recalled" because she "had been laid off and recalled several times during her tenure with" the employer and "[s]he had significant seniority." Id. at *5. Moreover, there was evidence that the employee's choice to accept the layoff was not entirely voluntary, because her workplace injury may have prevented her from meeting the demands of the new position. Id. at *6. Although the Panel did not address whether Wheeler received pay or benefits during the layoff, it did make reference to the testimony of her human resources representative, who stated that the employee continued her employment during the layoff. Id. at *2. Based upon these facts, the Panel held that Wheeler had not had a meaningful return to work and was not subject to the lower cap. Id. at *6.[6]

These Panel decisions demonstrate that the nature of layoffs vary. Indeed, Black's Law Dictionary has defined the term "layoff" broadly as "[t]he termination of employment at the employer's instigation; esp., the termination – either temporary or permanent – of many employees in a short time." Black's Law Dictionary 906 (8th ed. 2004) (emphasis added). But see Willis v. Franklin County Bd. of Educ., No. 01A01-9606-CH-00266, 1998 WL 391760, at *3 (Tenn. Ct. App. July 15, 1998) (defining "layoff" as "a period during which a worker is temporarily dismissed or allowed to leave work" and "a period of temporary dismissal with the anticipation of recall" (emphasis added)). Because layoffs and their effect on an employment relationship may take a variety of forms, we decline to adopt, as the trial court did, a bright line rule applicable to all layoffs. Instead, we continue to subscribe, as we did in Tryon, to a fact-intensive method for determining whether a layoff is a "loss of

_____

[6] The Panel has considered, with only limited analysis, the effect of a layoff on the employment relationship in other cases. See Harrison v. Peterbilt Motors Co., No. M2003-01457-WC-R3-CV, 2004 WL 2821630, at *3 (Tenn. Workers' Comp. Panel Dec. 9, 2004) (footnote omitted) (observing that it could "foresee circumstances where an employer could frustrate the purpose of the Workers' Compensation Act by keeping an employee on lay-off status indefinitely to avoid providing the employee with a higher award under" the reconsideration provision); Haywood v. Ormet Aluminum Mill Prods. Corp., No. W2001-01494-WC-R3-CV, 2002 WL 927440, at *3-4 (Tenn. Workers' Comp. Panel May 1, 2002) (finding no meaningful return to work when the employee was laid off by the pre-injury employer, even though the employee had returned to work for almost two-and-a-half years prior to the layoff).

employment" and, therefore, not a meaningful return to work under the workers' compensation statutes. Factors that may assist trial courts in the meaningful return to work inquiry include, but are not limited to, the following: (1) whether layoffs are a customary or expected part of the employee's position and, if so, whether the specific layoff in question falls within the pattern of previous layoffs in the position; (2) whether the employee expected or should have expected, at the time of the layoff, to be recalled to work; and (3) whether the employee received pay and/or benefits while laid off.

The Panel below appropriately considered the fact-specific approach that we prescribed in Tryon. Based upon our review of the record, however, we cannot agree with its ultimate assessment. Although the Panel relied upon Edwards when holding that the Employee had a meaningful return to work, the Panel in Edwards expressly reserved judgment regarding "other factual situations," such as those present here, "where the laid-off employee is receiving significantly less compensation and benefits during his or her lay-off period or where the employee is laid off after his or her initial workers' compensation case has been decided." 2008 WL 4378188, at *7 n. 14. By the application of all the pertinent factors, we hold that the loss of employment occurred when the Employee was laid off on April 27, 2007, shortly before his voluntary retirement.

There are several reasons for our assessment. Initially, the April layoff did not fall within the pattern of the previous layoffs. Although the Employer commonly engaged in biannual layoffs, during which its employees received neither pay nor benefits, those periods typically occurred during the summer and during the Christmas season. While the Panel, in finding for the Employer, ultimately ruled that the April 2007 layoff qualified as "customary," it also observed that "[i]f the pre-injury layoffs occurred in a patterned manner, then post-injury layoffs in a similar pattern do not equal unemployment," and "[i]f the pre-injury layoffs occurred sporadically based on business demand, then similar post-injury layoffs can be expected." (Emphasis added.) Instead of "occur[ing] sporadically," the Employer's seasonal layoffs occurred like clockwork, at the same time and for the same length of time nearly every year. Moreover, the April 2007 layoff, during which the Employee retired, was not "in a similar pattern" to those seasonal layoffs. The April 2007 layoff occurred at a different time of year, lasted longer, and affected a number of drivers whose seniority had previously served as protection. That David Wayne Barnes, the Murfreesboro terminal manager, described the April 2007 layoff as "totally different" from the "normal" seasonal layoffs is particularly compelling evidence. Because the April 2007 layoff was so very different, this factor suggests a termination of the employment relationship rather than a temporary layoff.

Second, the Employee did not know in April and May of 2007 when or if he would be recalled to work. While there was testimony that drivers had always been recalled at the

end of the seasonal layoffs, the indefinite shutdown at the Spring Hill plant was without precedent. Thus, the Employer had no way of predicting the length of time those drivers subjected to the layoff would be without work in Murfreesboro. Unlike the Wheeler case, 2010 WL 366672, at *5, the Employee could not "anticipate[] the availability of being recalled." Further, the fact that the Employee would have been recalled within weeks of his retirement is of little consequence. Initially, the proof establishes that the Employee would have been almost immediately laid off a second time because of the lack of business. The business slowdown continued at least until the time of trial.[7] More importantly, the key factor is not whether the Employee would actually have been recalled at the time he was laid off, but whether he knew or should have known at that time that a recall was likely. Given the unusual timing and duration of the layoff, the number of drivers affected, and the economic uncertainty surrounding the shutdown of the Spring Hill plant, it was reasonable for the Employee to determine that a recall to his pre-layoff position was unlikely. While perhaps only marginally so, this factor also suggests that the loss of employment occurred at the time of layoff. The Employee's subsequent retirement from the Teamsters Union, primarily for the purpose of obtaining health benefits, does not alter our view.

Finally, the Employee was not paid and did not receive health benefits during the term of the layoff. Instead, he was eligible to receive unemployment benefits and encouraged by the Employer to take temporary jobs. This, of course, differentiates the Employee from the circumstances of the employee in Edwards. Faced with an indefinite period of time without pay or benefits, it was reasonable for the Employee to choose retirement. Furthermore, because his seniority did not transfer to those other positions, the types of jobs available to the Employee at the other terminals likely would have been limited. The Employee's testimony that living and travel expenses related to those positions often outweighed any potential income was unrefuted. That the Employee chose to retire rather than take temporary jobs that were not equivalent to his previous position suggests that his return to work after the injuries did not qualify as meaningful.

---

[7]After retooling, which "virtually shut down the [Spring Hill] plant for 18 months," the plant began manufacturing the Chevrolet Traverse, a sport utility vehicle. Richard Locker, GM Will Let Tennessee Plant at Spring Hill Idle; May Make New Car, The Commercial Appeal, June 1, 2009, available at http://www.commercialappeal.com/news/2009/jun/01/spring-hill-gm-plant-going-standby-better-shutting/. On June 1, 2009, however, General Motors announced that it was moving the production of the Traverse to a Michigan facility and placing the Spring Hill plant on "standby," meaning that it could reopen, if needed, to support an increase in demand for automobiles. Id.; Nick Bunkley, G.M. Designates 14 Plants for Closing, N.Y. Times, June 1, 2009, available at http://www.nytimes.com/2009/06/02/business/02union.html?_r=1. The last Chevrolet Traverse rolled off of the Spring Hill assembly line on November 25, 2009. Eric Snyder, Retooling Gives Hope that Spring Hill GM Plant Could Rebound, Nashville Business Journal, Dec. 25, 2009, available at http://nashville.bizjournals.com/nashville/stories/2009/12/28/focus1.html. Since that time, the plant has employed less than one thousand workers and engaged in the production of engine parts. Id.

None of the factors we have applied today is conclusive. For example, there may be circumstances in which an employment relationship continues throughout a period of layoff even though the layoff was unexpected or indefinite, or the employee did not receive pay or benefits. An inquiry into all of the facts and circumstances surrounding this case, however, leads us to conclude that the loss of employment occurred at the time of the layoff, not the Employee's date of retirement. Although unpaid layoffs were an expected part of the Employee's job for the Employer, the nature of the April 2007 layoff indicates that the Employee was warranted in taking his retirement in May of 2007. His decision to do so should not preclude him from seeking reconsideration of the award for his 2004 injury under Tennessee Code Annotated section 50-6-241(d)(1)(B) or limit recovery for his 2005 injury to the lower 1.5 multiplier cap under Tennessee Code Annotated section 50-6-241(d)(1)(A).

## Conclusion

The Employee did not make a meaningful return to work due to the nature of his layoff in April of 2007. The trial court properly concluded that the award for the Employee's 2005 shoulder injury was subject to the higher cap set forth in Tennessee Code Annotated section 50-6-241(d)(2)(A), rather than the lower cap of 1.5 mandated by section 50-6-241(d)(1)(A). Further, because the layoff of the Employee in April of 2007 constituted a loss of employment, the Employee's subsequent retirement does not preclude reconsideration of the settlement of his 2004 neck injury pursuant to section 50-6-241(d)(1)(B). The judgment of the Chancery Court is reinstated. Costs are assessed to the Employer, Jack Cooper Transport Company, Inc., for which execution, if necessary, may issue.

_____
GARY R. WADE, JUSTICE