# IN THE SUPREME COURT OF TENNESSEE
## SPECIAL WORKERS' COMPENSATION APPEALS PANEL
## AT KNOXVILLE
April 29, 2014 Session

## TRACY W. HAMILTON v. PEMBERTON TRUCK LINES, INC. ET AL.

**Appeal from the Circuit Court for Monroe County**
**No. V11347P      Larry H. Puckett, Judge**

---

**No. E2013-01329-WC-R3-WC-Mailed June 16, 2014 / Filed July 16, 2014**

---

The employee sustained a work-related injury to his cervical spine. The trial court found permanent and total disability as a result of the injury. The employer has appealed, contending that the evidence preponderates against the trial court's finding. The appeal has been referred to the Special Workers' Compensation Appeals Panel for a hearing and a report of findings of fact and conclusions of law pursuant to Tennessee Supreme Court Rule 51. We affirm the judgment of the trial court.

**Tenn. Code Ann. § 50-6-225(e) (2008 & Supp. 2013) Appeal as of Right; Judgment of the Trial Court Affirmed**

GARY R. WADE, C.J., delivered the opinion of the Court, in which E. RILEY ANDERSON, SP. J., and JON KERRY BLACKWOOD, SR. J., joined.

Robert M. Asbury, Knoxville, Tennessee, for the appellants, Pemberton Truck Lines, Inc. and Cherokee Insurance Company.

John A. Willis, Clinton, Tennessee, for the appellee, Tracy W. Hamilton.

## OPINION
### I. Facts and Procedural Background

Tracy W. Hamilton (the "Employee"), a tractor-trailer driver for Pemberton Truck Lines, Inc. (the "Employer"), hauled trailers between Tennessee, Florida, and Georgia. As part of his duties, the Employee was required to weigh and scale the trailer to ensure that the weight was properly distributed over the axles. On August 30, 2007, the Employee delivered an empty trailer to the PetSmart distribution center located in Newnan, Georgia, and picked up a loaded trailer. Thereafter, the Employee drove the tractor-trailer to a Pilot truck stop to

scale the trailer. Because the weight was unbalanced, the Employee "pulled the pin" to adjust the tractor-trailer's weight distribution.[1]

After pulling the pin, the Employee "took a few steps," experienced "really bad pain in the neck and arm and shoulder," and "went to the ground." He notified the Employer of his injury but initially declined medical treatment, stating that he would "just give it a day or two" to "see if [the pain would] ease up."

Over the course of the next week, the Employee experienced pain from his neck into the back of his head, around his left ear, and down into his shoulder and arm. After also experiencing numbness and tingling in his left hand, the Employee contacted the Employer and asked permission to see a doctor. He was referred to an occupational clinic where he underwent conservative medical treatment consisting of injections designed to relax the muscles of the neck. When the effects of the injections wore off, however, the pain persisted, and the Employee was eventually referred to Dr. Paul Peterson, a neurosurgeon.

Dr. Peterson testified by deposition that he first treated the Employee on October 15, 2007. The Employee complained of pain in the left side of his neck, left arm pain, and numbness in his left arm, left thumb, index finger, and middle finger. The MRI results indicated a herniated disc at C6-7, which Dr. Peterson believed to be a result of the August 30, 2007 injury. Later, Dr. Peterson performed surgery, removed a disc, and, afterward, prescribed physical therapy.[2]

On June 4, 2008, the Employee reported an increased level of pain in his neck, and more pain and tingling in his arm. A second MRI indicated a new herniated disc with cord compression at C4-5, which Dr. Peterson believed to be directly related to the Employee's work injury. A second surgery was performed, and, after this surgery, the Employee was referred for pain management therapy.

Dr. Joe Hugh Browder, a physician with Pain Consultants of East Tennessee, began

_____

[1] The Employee testified that an 80,000 pound weight limit applies to each axle. Some tractor-trailers are equipped with a sliding subassembly used to adjust the weight distribution over the axles. Alice Adams, Trucking: Tractor-Trailer Driver Handbook/Workbook 170 (3d ed. 2005). Four locking pins are controlled by a locking lever, which, when pulled, disengages the locking pins and allows the trailer to slide along the frame rails. Id. at 172-73. Once the trailer's weight is properly distributed, the pins are returned to the lock position to keep the trailer from moving. Id. at 172.

[2] The Employee had undergone a similar surgery in 2001 or 2002 for an injury sustained while inspecting termite cells for a previous employer. After his first surgery, the Employee participated in physical therapy and was eventually released to return to work without restrictions.

treating the Employee on May 29, 2009. Dr. Browder testified by deposition that he experimented with several types of medication, eventually finding that the Employee benefitted from a Liboderm patch, which provided relief from muscle spasms. In addition, Dr. Browder prescribed a relatively low dose of Opana for pain, and the use of a VitalWrap, a machine that provides alternating hot and cold therapy. It was his opinion that the Employee would be required to take pain medication indefinitely.

On February 23, 2011, Dr. Peterson determined that the Employee had reached maximum medical improvement, although he continued to experience chronic neck pain and reported symptoms of depression. Based upon his assessment using the Sixth Edition of the American Medical Association Guides to the Evaluation of Permanent Impairment ("AMA Guides"), Dr. Peterson calculated the Employee's impairment rating as 25% to the body as a whole.[3] The Employee was placed on light-duty restrictions, specifically limiting his exertion to twenty pounds of force occasionally, up to ten pounds of force frequently, and negligible amounts of force consistently.

Dr. William E. Kennedy, an orthopedic surgeon, testified by deposition that he conducted an independent medical examination in 2012. After interviewing the Employee as to the circumstances surrounding his injury and reviewing his medical records, Dr. Kennedy, using the Fifth Edition of the AMA Guides, assigned the Employee a 12% permanent physical impairment rating to the body as a whole, a rating later stipulated by the parties. Dr. Kennedy recommended that the Employee permanently refrain from rapid, repeated motions with either hand, or operating vehicles or machinery under conditions that would subject him to jostling or rapid stops or starts. It was his opinion that the Employee should refrain from elevating his hands above shoulder-level and avoid any attempt to climb ladders, crawl on his hands and knees, or engage in other activities that would subject him to vibrations, such as driving a motor vehicle for prolonged periods. Dr. Kennedy restricted the Employee from carrying, pushing, or pulling more than twenty pounds occasionally or ten pounds frequently. He also believed that the Employee's ongoing medical regimen, consisting of Opana medication, would compromise his cognitive function, limiting his ability to focus on one particular task for prolonged periods of time, and would cause drowsiness, which would decrease his reflexes and response time.

The Employee also offered the testimony of Dr. Rodney Caldwell, a vocational evaluator. Dr. Caldwell testified that he interviewed the Employee to obtain basic

---

[3] It is undisputed that, at the time of the injury, the Sixth Edition of the AMA Guides was not in effect and, to meet the statutory requirements of Tennessee Code Annotation sections 50-6-102(2) and -204(d)(3)(C) (2008 & Supp. 2013), the Employee's impairment rating should have been calculated pursuant to the Fifth Edition.

information regarding the Employee's age, education, training, and work experiences, as well as his own statement of functional capacities. In addition, Dr. Caldwell administered the Wide Range Achievement Test 4 and the Minnesota Manual Dexterity Test. The Wide Range Achievement Test 4 is designed to evaluate academic achievement and contains four parts: word pronunciation, sentence comprehension, spelling, and math computation. The Employee scored above the twelfth grade level. The Minnesota Manual Dexterity Test assesses a person's ability to use his or her arms and hands.[4] Dr. Caldwell observed that the Employee's performance was below average and "very slow." Dr. Caldwell also testified that he measured the Employee's grip strength as thirty-four pounds for his right hand and thirty-three pounds for his left hand, one-third of the norm for the male population. He further noted that the Employee had a sitting and standing tolerance of five minutes at a time. Based on his evaluation, Dr. Caldwell opined that the Employee could not "perform any significant gainful activity, either part time or full time."

Dr. Craig Colvin, a retired professor from the University of Tennessee and an independent consultant in disability management, testified for the Employer. He found the Employee to be honest and "forthright," and, based upon his review, Dr. Colvin determined that the Employee had accumulated transferable skills from his diverse employment background, which provided the Employee with a greater opportunity for employability. In his opinion, the Employee could perform sedentary or light-duty work,[5] including holding a position as a store greeter, a dispatcher, or an assembler. He conceded that the Employee would be unable to perform a job requiring him to stand the entire shift and acknowledged that the Employee was unable to perform any of his previous jobs.

At the conclusion of the proof, the trial court found that the Employee suffered an accidental injury arising out of and in the course and scope of his employment with the Employer. Further, the trial court ruled that the Employee was permanently and totally disabled as a result of the injury and awarded benefits in the amount of $441,123.66, to be paid as a lump sum pursuant to Tennessee Code Annotated section 50-6-207(4)(A)(ii) (2008 & Supp. 2013), and attorneys' fees in the amount of $34,641.60, pursuant to Tennessee Code Annotated section 50-6-207(4)(A)(iii).

Thereafter, the Employer moved to set aside the judgment. The trial court denied the motion, and the Employer appealed. The sole issue presented for our review is whether the trial court erred by determining that the Employee was totally and permanently disabled as

---

[4] Dr. Caldwell testified that the test uses a large board with sixty holes in it, each containing what looks like a large checker. The test-taker is asked to remove the checker with one hand, turn it over, and place it back in the original hole with the other hand.

[5] The terms "sedentary" and "light duty" are based on Department of Labor categories.

a result of his work-related injury. See Tenn. Code Ann. § 50-6-207(4)(B) ("When an injury . . . totally incapacitates the employee from working at an occupation that brings the employee an income, the employee shall be considered totally disabled . . . ."). Specifically, the Employer claims that medical expert testimony of permanent and total disability is essential for recovery in this instance.

## II. Standard of Review

A trial court's findings of fact in a workers' compensation case are reviewed de novo accompanied by a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise. Tenn. Code Ann. § 50-6-225(e)(2) (2008 & Supp. 2013); see also Tenn. R. App. P. 13(d). "'This standard of review requires us to examine, in depth, a trial court's factual findings and conclusions.'" Williamson v. Baptist Hosp. of Cocke Cnty., Inc., 361 S.W.3d 483, 487 (Tenn. 2012) (quoting Galloway v. Memphis Drum Serv., 822 S.W.2d 584, 586 (Tenn. 1991)). When the trial court has seen and heard the witnesses, considerable deference must be afforded to the trial court's findings of credibility and the weight that it assessed to those witnesses' testimony. Tryon v. Saturn Corp., 254 S.W.3d 321, 327 (Tenn. 2008) (citing Whirlpool Corp. v. Nakhoneinh, 69 S.W.3d 164, 167 (Tenn. 2002)). The same deference need not be extended to findings based on documentary evidence such as depositions. Glisson v. Mohon Int'l, Inc./Campbell Ray, 185 S.W.3d 348, 353 (Tenn. 2006). Indeed, where medical expert testimony is presented by deposition, we may independently assess the content of that proof in order to determine where the preponderance of the evidence lies. Williamson, 361 S.W.3d at 487 (quoting Trosper v. Armstrong Wood Prods., Inc., 273 S.W.3d 598, 604 (Tenn. 2008)). On questions of law, our standard of review is de novo with no presumption of correctness. Mansell v. Bridgestone Firestone N. Am. Tire, LLC, 417 S.W.3d 393, 399 (Tenn. 2013) (citing Nichols v. Jack Cooper Transp. Co., 318 S.W.3d 354, 359 (Tenn. 2010)).

## III. Analysis

Pursuant to Tennessee Code Annotated section 50-6-207(4)(B), "[w]hen an injury . . . totally incapacitates the employee from working at an occupation that brings the employee an income, the employee shall be considered totally disabled." (Emphasis added.) The inquiry "'focus[es] on the employee's ability to return to gainful employment,'" Cleek v. Wal-Mart Stores, Inc., 19 S.W.3d 770, 774 (Tenn. 2000) (quoting Davis v. Reagan, 951 S.W.2d 766, 767 (Tenn. 1997)), and, thus, our laws "make clear[ that] the legal definition of permanent total disability does not carry the same meaning as permanent and total medical disability," id. It is, therefore, well established that "the determination of permanent and total disability is to be based on a variety of factors such that a complete picture of an individual's ability, or inability, to return to gainful employment is presented before the court." Vinson v. United Parcel Serv., 92 S.W.3d 380, 386 (Tenn. 2002) (citing Cleek, 19 S.W.3d at 774; see also Hubble v. Dyer Nursing Home, 188 S.W.3d 525, 535 (Tenn. 2006). Relevant factors

include "the employee's skills, training, education, age, job opportunities in the immediate and surrounding communities, and the availability of work suited for an individual with that particular disability." Hubble, 188 S.W.3d at 535-36 (citing Cleek, 19 S.W.3d at 774). Although an assessment of permanent total disability is often presented through the testimony of a vocational specialist, the "employee's own assessment of his or her overall physical condition, including the ability or inability to return to gainful employment, is competent testimony that should be considered[,]" regardless of whether an expert testifies. Id. at 536 (quoting Vinson, 92 S.W.3d at 386) (internal quotation marks omitted). If expert testimony is presented, the trial court generally has the discretion to accredit the testimony of one expert over another. Fritts v. Safety Nat'l Cas. Corp., 163 S.W.3d 673, 679 (Tenn. 2005) (citing Hinson v. Wal-Mart Stores, Inc., 654 S.W.2d 675, 676-77 (Tenn. 1983)).

The Employer, relying upon our supreme court's decisions in Nelson v. Wal-Mart Stores, Inc., 8 S.W.3d 625 (Tenn. 1999), and Cleek, contends that the Employee failed to meet his burden of demonstrating that he was permanently and totally disabled because no medical expert testified that the Employee was unable to work at an occupation that would have earned him income. We disagree.

In Nelson, the sixty-seven-year-old employee fell and broke her hip while helping another employee move a rolled-up rug. 8 S.W.3d at 627. After surgery, the employee's treating physician assessed a permanent impairment of 8% to the body as a whole, imposed standing and lifting restrictions, and recommended that the employee "attempt to return to . . . work a four-hour day" with frequent breaks. Id. At trial, the employee and her daughter testified that the injury had affected the employee's ability to walk and care for herself. Id. at 628. A vocational expert also testified at trial that the employee "had no reasonable employment opportunities[,]" that, "at most[, the employee] could perform part-time sedentary work[,] and that she had no transferable job skills." Id. No testimony, however, established that the employee was unable to perform the position of a door greeter—a position offered to the employee and one within her restrictions. Id. Based upon this testimony and the restrictions imposed by the treating physician, the trial court determined that the employee had suffered a permanent partial disability, rather than a permanent total disability. Id. The supreme court affirmed, concluding that the evidence did not preponderate against the trial court's finding of permanent partial disability. Id. at 629.

In Cleek, the seventy-two-year-old employee suffered a four-part fracture to her left shoulder after she tripped over pallets at work. 19 S.W.3d at 772. The employee's treating physician recommended that she forego surgery, and she was returned to work with several restrictions. Id. At trial, the employee testified that although she returned to work, she had significant difficulty performing many of the duties she had previously performed. Id. She further testified, and her treating physician confirmed, that given her injury, age, intense pain,

and inability to continue working, it was in her best interest to retire. Id. at 772-73. The trial court concluded that the employee "ha[d] no future in the job market other than what the defendant [wa]s willing to give her" and assessed a permanent partial disability. Id. at 773. The supreme court, however, modified the award to include a permanent total disability because even though no vocational expert had testified that the employee was permanently and totally disabled, the trial court had accredited the employee's testimony and concluded that she "ha[d] no future in the job market." Id. at 775-76.

Neither of these cases stands for the proposition that medical expert testimony is required in order to establish a permanent and total disability. In Nelson, the supreme court determined that the employee was limited to an award of permanent partial disability because, despite the employee's claim that she was permanently and totally disabled, her vocational expert testified that she was able to perform sedentary, light-duty work within her restrictions and, therefore, the evidence failed to establish that her injury "totally incapacitate[d] her from working at an occupation which brings . . . an income." 8 S.W.3d at 629 (internal quotation marks omitted). In Cleek, the supreme court determined that the employee was permanently and totally disabled because she "ha[d] no future in the job market" based in large part upon the employee's testimony as to her inability to perform her job duties, and despite the lack of expert testimony that the employee suffered a permanent and total disability. 19 S.W.3d at 775. In each of these cases, the ultimate determination of the extent of disability was based not upon the presence or absence of medical expert proof, but upon the appropriate deference afforded to the trial court's assessment of the credibility of the witnesses and any findings as to whether the employee could return to gainful employment. See id.

Moreover, in Vinson v. United Parcel Service, our supreme court explicitly rejected the employer's argument that the employee failed to meet his burden of proof "because the evidence offered at trial was limited to the testimony of the [employee] and the C-32 report completed by the [employee's] physician." 92 S.W.3d at 385. The trial court had declined to award permanent and total disability benefits because it had determined there was "simply insufficient medical and/or expert proof in the record to support a finding that [the employee] is permanently and totally disabled." Id. at 383. While recognizing that permanent and total disability is typically proven by the use of expert testimony, our supreme court disagreed with the trial court, finding that "[u]nlike Nelson, no evidence was presented at trial to challenge [the employee's] claim of permanent and total disability," id. at 386, and that the employee's "testimony, coupled with the C-32 report, [were] sufficient to support a finding of permanent and total disability," id. at 385.

Turning to the facts of this case, the trial court determined that the Employee was permanently and totally disabled. In doing so, the trial court specifically accredited the

Employee's testimony as to his own limitations and the statements he made to the vocational experts. The Employee testified that he was unable to sit for long periods of time and had difficulty concentrating due to his medication. Moreover, the two vocational experts agreed that the Employee was unable to return to any of his previous employment positions and only disagreed as to the extent of the Employee's disability—Dr. Caldwell opined that the Employee was permanently and totally disabled, whereas Dr. Colvin opined that the Employee sustained a physical impairment of 85% to 90% and could return to gainful employment. The trial court ultimately accredited the testimony of the Employee and the conclusion of Dr. Caldwell. Because the Employee, Dr. Caldwell, and Dr. Colvin testified at trial, the trial court had a firsthand opportunity to assess their credibility. The evidence does not preponderate against the findings of the trial court.

## IV. Conclusion

So long as the evidence demonstrates by a preponderance of the evidence the complete vocational disability of the employee, a finding of permanent and total disability is permitted, regardless of whether medical expert testimony is presented in that regard. Because the evidence in this case is sufficient to support a finding of permanent and total disability, the judgment of the trial court is affirmed. Costs are taxed to Pemberton Truck Lines, Inc. and Cherokee Insurance Company, and their surety, for which execution may issue if necessary.

_____
GARY R. WADE, CHIEF JUSTICE

# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### April 29, 2014 Session

## TRACY W. HAMILTON v. PEMBERTON TRUCKING LINES, INC., ET AL.

**Circuit Court for Monroe County**
**No. V11347P**

---

**No. E2013-01329-WC-R3-WC**

---

## JUDGMENT

This case is before the Court upon the entire record, including the order of referral to the Special Workers' Compensation Appeals Panel, and the Panel's Memorandum Opinion setting forth its findings of fact and conclusions of law, which are incorporated herein by reference.

Whereupon, it appeals to the Court that the Memorandum Opinion of the Panel should be accepted and approved; and

It is, therefore, ordered that the Panel's findings of fact and conclusions of law are adopted and affirmed, and the decision of the Panel is made the judgment of the Court.

Costs of this appeal are taxed to Pemberton Truck Lines, Inc. and Cherokee Insurance Company, and their surety, for which execution may issue if necessary.

IT IS SO ORDERED.

PER CURIAM