# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### June 1, 2011 Session

## ALICIA D. HOWELL v. NISSAN NORTH AMERICA, INC., ET AL.

**Appeal by Permission from the Special Workers' Compensation Appeals Panel
Circuit Court for Moore County
No. 931      F. Lee Russell, Judge**

---

### No. M2009-02567-SC-WCM-WC - Filed August 11, 2011

---

The issue presented in this workers' compensation case is whether the employee made a meaningful return to work.  Upon being released by her physician to return to work, she resigned her employment after her employer told her that she would have to return to a production line job that, based on her work experience and personal knowledge of the work conditions and her physical abilities and limitations, she did not believe she could perform.  The trial court awarded her additional benefits, ruling that she did not have a meaningful return to work and was eligible for reconsideration of her earlier settlement for workers' compensation benefits pursuant to Tennessee Code Annotated section 50-6-241 (Supp. 2010).  The Special Workers' Compensation Appeals Panel reversed.  We hold that the employee did not have a meaningful return to work following her injuries and that the evidence does not preponderate against the trial court's award of increased permanent partial disability benefits.  The judgment of the Appeals Panel is reversed, and the judgment of the trial court is reinstated.

**Tenn. Code Ann. § 50-6-225(e)(6) (2008); Judgment of the Special Workers'
Compensation Appeals Panel Reversed**

SHARON G. LEE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, and GARY R. WADE, JJ., joined.  WILLIAM C. KOCH, JR., J., not participating.

Trisha L. Henegar, Shelbyville, Tennessee, for the appellant, Alicia D. Howell.

Frank C. Lynch, Winchester, Tennessee, for the appellees, Nissan North America, Inc., and Ace America, TPA, ESIS, Inc.

# OPINION

## Background

The employee, Alicia D. Howell, began working for Nissan North America, Inc., ("Nissan") in 2003. She worked the night shift on the assembly production line known as the "ZH" line. Ms. Howell's work on the ZH line involved, among other things, the use of a pneumatic gun to bolt parts on V-8 motors. In August of 2006, Nissan began training Ms. Howell and other employees on the "TR" production line, which involved working on four-cylinder engines moving on a faster-moving conveyor belt, and also required the use of a pneumatic gun. Ms. Howell worked on the TR line for three Friday shifts.

Around the time she started training on the TR line, Ms. Howell testified that she began feeling pain, numbness, and tingling in both of her hands. She continued having these symptoms when she worked her usual ZH line position. Ms. Howell reported her injuries to Nissan on September 14, 2006. Nissan referred her to Dr. Richard Rogers, an orthopaedic surgeon. Dr. Rogers diagnosed her with bilateral carpal tunnel syndrome and performed carpal tunnel release surgery on Ms. Howell's right hand on November 11, 2006, and on her left hand on January 3, 2007. On March 2, 2007, he released Ms. Howell to return to work with the restriction that she not operate a pneumatic gun. However, Ms. Howell testified that Nissan did not allow her to return to work at that time because Nissan "wanted me to come back with no restrictions."

Ms. Howell returned to Dr. Rogers on April 23, 2007, and he released her with no work restrictions. Ms. Howell returned to her work on the ZH line on April 23, 2007. She testified that the symptoms in her hands continued following her return to work and that she "couldn't hold on to things" and was unable to keep up with the speed of the assembly line. Ms. Howell further testified that she received an oral warning from her supervisor, Tim Cowan, that she "was not fast enough to do the job" and that she "needed to work on [her] speed." On one occasion she dropped a piece of equipment on her arm, causing "a big bruise and a knot over there because [she] couldn't hold on to it." Ms. Howell wrote a letter to Dr. Rogers stating that she was experiencing the same problems and that she needed to return to see him. On July 17, 2007, Dr. Rogers again placed her on the medical restriction of not using a pistol-grip pneumatic gun.

Around the same time, in mid-July of 2007, Ms. Howell began suffering other non-work-related problems including weight loss, stomach problems related to acid reflux disorder, dizziness, and depression. She saw her primary care physician, Dr. Todd Stegall, and upon Dr. Stegall's recommendation she went on medical leave from work due to these conditions on July 25, 2007.

Ms. Howell testified that she called her supervisor each week she was on medical leave to check in and let him know her condition and progress. On August 7, 2007, Ms. Howell again saw Dr. Rogers. He assigned Ms. Howell a permanent partial impairment of 5% to each upper extremity based on the American Medical Association's Guides to the Evaluation of Permanent Impairment, Fifth Edition and released her to return to work with no restrictions.

Ms. Howell and Nissan settled her workers' compensation claim for her carpal tunnel injuries on September 14, 2007. In the settlement, the parties agreed that Ms. Howell's injury resulted in an overall industrial disability rating of 6.375%, which was 1.275 times her 5% permanent partial impairment rating. Ms. Howell testified that at the time of the settlement, she was planning to return to work and had every intention of returning to work for Nissan. Ms. Howell further testified that Nissan had previously made some of its employees, including her, an employment buyout offer and that she had declined because she loved to work there and it was by far the best-paying job she had ever had.

On November 13, 2007, Dr. Stegall released Ms. Howell to return to work, and she called Mr. Cowan to tell him she was ready to return to work. Ms. Howell testified that Mr. Cowan told her that everyone coming off medical leave would be assigned to the TR production line. Ms. Howell told Mr. Cowan that there was no way she could work the TR line because of her problems with her hands and the speed of the line. Ms. Howell testified that she believed she would have been able to return to the ZH line, but that Mr. Cowan offered her no other option but to return to the TR line:

> Well, he didn't really recommend me to do anything. He just, you know, there was no other options. I either had to come back on the TR line or not come back at all so I – and I knew – I know my hands. I struggled for so long with these hands. And I was in so much pain, I knew I couldn't do it. I couldn't put my body through it no more. And so I did quit, you know, because I knew I – you know, there's no way I could – they were depleting the night shift. That's the reason everybody was having to go – and as of right now, there is no ZH hot test night shift.

When asked on cross-examination why she did not try to return to work the TR line, Ms. Howell explained:

> Well, because I was having – on my original line I was having so much trouble. . . . [T]his line was so much faster than my original line . . . these motors [were] coming three or four times faster than what they normally do on my line. And I couldn't keep up on my regular line, so I knew, you know,

there – I wouldn't be able to do it. There was no way [with] my hands with the trouble that I was having already with them.

. . . .

Q: And it's just a fact that you don't know for certain, for certain, that you could have done the work on the TR line.

A: Oh, I know for certain that –

Q: You know for certain.

A: – there's no way I could have done that, no.

Q: Even though you hadn't given it a try.

A: Well, I had worked there before. I knew what it consisted of. I knew that there was no way I could do it. Why risk . . . getting to a point where I can't use my hands for anything? Why risk doing that to myself when I knew good and well that I couldn't work, I couldn't do that? And, I mean, with pains, the way that I was having them, I mean, it was – there's just no way I could possibly do it.

The day after her conversation with Mr. Cowan, Ms. Howell called Nissan's human resources department and resigned, explaining that she was physically unable to work the TR line.

Mr. Cowan's recollection of the conversation with Ms. Howell was significantly different. Mr. Cowan testified that he only told Ms. Howell that there was a possibility that she would be assigned to the TR line, and that the decision was up to his supervisor. Mr. Cowan testified that Ms. Howell mentioned other concerns about returning to work that involved her assignment to the night shift and her children growing up. But Mr. Cowan admitted that Ms. Howell had worked the night shift without complaint over the entire course of her employment, and that he had no indication that she had ever tried to get moved to the day shift in the past. Mr. Cowan agreed that Ms. Howell told him that there was no way she would be able to work on the TR line.

Following her resignation on November 14, 2007, Ms. Howell began a six-month search for other employment. In May of 2008, she was hired at minimum wage for a temporary staffing agency, feeding envelopes into a batch printer. At the time of trial she was still working this job. Ms. Howell testified that she still suffers from the same symptoms in her hands, but the work "is not near as bad because I'm not doing anything with power tools." Ms. Howell further stated that her grasp remained impaired, that she was unable to use power tools or vibrating machinery, and that she was unable to garden, drive other than short distances, or do heavy housework.

On August 18, 2008, Ms. Howell filed a petition for reconsideration of her earlier workers' compensation settlement pursuant to Tennessee Code Annotated section 50-6-241(d)(1)(B) (Supp. 2010). After a hearing, the trial court held that Ms. Howell was eligible for reconsideration of her workers' compensation benefits because she did not have a meaningful return to work. The trial court resolved the factual differences in the accounts of the November 13, 2007 conversation between Ms. Howell and Mr. Cowan in Ms. Howell's favor, specifically finding her "to be entirely credible in her description of the conversation." Thus, the trial court concluded that Ms. Howell "was told she would be returning to the TR line, and under those circumstances the Employee was reasonable in resigning and that was not reasonable on the part of the Employer." The trial court awarded Ms. Howell a 25% permanent partial disability rating to each upper extremity.

Nissan appealed. The Special Workers' Compensation Appeals Panel reversed, finding that Ms. Howell's decision to resign rather than returning to work "to see what happened when she performed her job duties" was unreasonable. We granted this appeal to address the issues of whether the Appeals Panel erred in holding that Ms. Howell had a meaningful return to work and whether the trial court's award of 25% permanent partial disability to each upper extremity was excessive.

**Analysis**

We review the trial court's findings of fact "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. Code Ann. § 50-6-225(e)(2) (2008). We must afford considerable deference to the trial court's findings of fact based upon the court's assessment of live testimony. Dixon v. Travelers Indem. Co., 336 S.W.3d 532, 536 (Tenn. 2011); Padilla v. Twin City Fire Ins. Co., 324 S.W.3d 507, 511 (Tenn. 2010).

*Meaningful Return to Work*

The Tennessee Workers' Compensation Law limits the amount of permanent partial disability benefits an injured employee may receive when "the pre-injury employer returns the employee to employment at a wage equal to or greater than the wage the employee was receiving at the time of the injury." Tenn. Code Ann. § 50-6-241(d)(1)(A). For injuries occurring on or after July 1, 2004, an employee who returns to work at a wage equal to or greater than the employee's pre-injury wage may receive a maximum permanent partial disability benefit of 1.5 times the employee's medical impairment rating. Id.

An employee may seek reconsideration of an award of permanent partial disability benefits for a scheduled member if the employee is subsequently no longer employed by the pre-injury employer at the specified wage:

> If an injured employee receives benefits for schedule member injuries pursuant to subdivision (d)(1)(A), and the employee is subsequently no longer employed by the pre-injury employer at the wage specified in subdivision (d)(1)(A), the employee may seek reconsideration of the permanent partial disability benefits. The right to seek the reconsideration shall extend for the number of weeks for which the employee was eligible to receive benefits under § 50-6-207, beginning with the day the employee returned to work for the pre-injury employer.

Tenn. Code Ann. § 50-6-241(d)(1)(B)(ii). The trial court may award an employee who qualifies for such reconsideration additional permanent partial disability benefits up to a statutory maximum of six times the employee's medical impairment rating. Tenn. Code Ann. § 50-6-241(d)(2)(A). However, where the employee subsequently voluntarily resigns or retires, Tennessee Code Annotated section 50-6-241(d)(1)(B)(iii) provides that "under no circumstances shall [the] employee be entitled to reconsideration when the loss of employment is due to . . . [t]he employee's voluntary resignation or retirement; provided . . . that the resignation or retirement does not result from the work-related disability that is the subject of such reconsideration."

In determining whether an employee is eligible for reconsideration of his or her award of permanent partial disability benefits, courts inquire as to whether the employee has had a meaningful return to work following a work-related disability. Tryon v. Saturn Corp., 254 S.W.3d 321, 328 & n.9 (Tenn. 2008); Lay v. Scott Cnty. Sheriff's Dep't, 109 S.W.3d 293, 297 (Tenn. 2003); Nelson v. Wal-Mart Stores, Inc., 8 S.W.3d 625, 629 (Tenn. 1999). If the employee is found to have had a meaningful return to work, his or her benefits are capped using the smaller multiplier of one and one-half in Tennessee Code Annotated section 50-6-241(d)(1)(A). If the employee is found not to have had a meaningful return to work, his or her benefits are capped using the larger multiplier of six in section 50-6-241(d)(2)(A). See Nichols v. Jack Cooper Transp. Co., 318 S.W.3d 354, 361 (Tenn. 2010); Tryon, 254 S.W.3d at 328. As we recently stated in Tryon, "[w]hen determining whether a particular employee had a meaningful return to work, the courts must assess the reasonableness of the employer in attempting to return the employee to work and the reasonableness of the employee in failing to either return to or remain at work." 254 S.W.3d at 328. The assessment of the reasonableness of the actions of the employee and employer is highly fact-intensive and "depends on the facts of each case." Id.

Nissan argues that the Appeals Panel correctly determined that Ms. Howell should be deemed to have had a meaningful return to work, and Ms. Howell argues that the trial court correctly ruled that her decision to resign rather than to try to return and work the TR line was reasonable under the circumstances, and that therefore she did not have a meaningful return to work. We agree with Ms. Howell. As the trial court correctly observed, the telephone conversation between Ms. Howell and her supervisor, Mr. Cowan, is of central importance to a determination of the reasonableness of Ms. Howell's decision to resign. She testified that Mr. Cowan told her unequivocally that she would be placed on the TR production line upon her return to work. Ms. Howell further testified that she expressed her concerns that she would be unable to keep up with the work required on the faster TR line due to her medical condition and carpal tunnel symptoms, but that neither Mr. Cowan nor the person she spoke with from Nissan's human resources department the next day offered her any other option. Mr. Cowan's version of the conversation was substantially different, although he did agree that Ms. Howell expressed concerns about being able to work the TR line. The trial court, having viewed the witnesses live and observed their demeanor while testifying, found Ms. Howell to be "entirely credible" and credited her testimony regarding the conversation. The evidence does not preponderate against this conclusion.

The trial court further found that Ms. Howell intended and wanted to return to work following her injury, crediting her testimony to that effect and observing that she had previously declined Nissan's buyout offer, and that her job with Nissan was the best and by far the highest-paying job she had ever had. In Tryon, we observed that Tennessee courts applying the Workers' Compensation Law

> have found that an employee who later resigned or retired did not have a meaningful return to work when (1) the employee's workplace injury rendered the employee unable to perform his or her job, (2) the employer refused to accommodate the employee's work restrictions arising from the workplace injury, and (3) the employee's workplace injury caused too much pain to permit the employee to continue working.

254 S.W.3d at 329 (footnotes omitted). Giving due deference to the trial court's findings of fact based on its observation of the witnesses and credibility determinations, arguably all three of the above factors are present to some degree in this case. Nissan points to our observation in Tryon that "the courts have determined that an employee who resigned or retired after returning to work had a meaningful return to work when the employee's decision to retire or resign was based on . . . the employee's unfounded anxiety about being transferred to a position that would exceed work restrictions." Id. In this case, however, the evidence does not preponderate against the trial court's implicit conclusion that the anxiety Ms. Howell felt about being transferred to the TR line was not unfounded, but was founded

on her prior experience at work, her personal knowledge of the work conditions, and her physical abilities and limitations.

The undisputed evidence established that Ms. Howell had been trained on the TR line and actually worked three full shifts on that line. She was fully familiar with the demands and requirements of the TR line position. Ms. Howell testified that her symptoms with her hands began occurring shortly after her training on the TR line. She testified that on the TR production line, between 70 and 76 motors typically came down the line per hour; on the ZH line that she normally worked, between 12 and 20 motors typically came down the line per hour. Mr. Cowan confirmed in his testimony that "the TR assembly line has to run a faster line speed which means that the technician has a shorter period of time to meet their cycle requirements to get the production number."[1] The evidence does not preponderate against the trial court's conclusion that Ms. Howell's decision to resign was reasonable under the circumstances.

### *Amount of Workers' Compensation Award*

Nissan argues that the amount that the trial court awarded Ms. Howell upon reconsideration of her permanent partial disability benefits, an award reflecting a 25% permanent partial impairment rating to each upper extremity, is excessive. We disagree. "'[I]t is well established that the extent of vocational disability is a question of fact to be determined from all the evidence, including lay and expert testimony.'" Tryon, 254 S.W.3d at 335 (quoting Collins v. Howmet Corp., 970 S.W.2d 941, 943 (Tenn. 1998)). Although an appellate court may certainly reverse or modify a trial court's award of workers' compensation benefits under the appropriate circumstances, it is not the role of an appellate court to simply substitute its judgment for that of the trial court in assessing the employee's vocational disability. Tryon, 254 S.W.3d at 335.

In this case, Ms. Howell was forty years old at the time of trial. Her three children were then ages 24, 18, and 16. Ms. Howell had an eleventh grade education and later obtained her GED; she had no additional vocational or technical training. The trial court found that Ms. Howell "has a very narrow work history basically related to sewing, manual, lots of repetitive hand work." Ms. Howell testified that her job with Nissan was by far the highest-paying job she had ever had. She was earning approximately $1,000 per week prior to her injuries. Ms. Howell searched for other employment for six months before she was able to find a job that was classified as temporary and paid her minimum wage. She is

---

[1] Mr. Cowan further testified that the number of parts required to be attached to the motors on the TR line was smaller than the number of parts required to be attached to the motors on the ZH line, so that in his estimation, the amount of work "basically equals out to be the same."

unable to operate heavy or vibrating machinery or do many repetitive manual tasks. Ms. Howell testified that her grasp is still impaired and she has trouble holding on to things. Under these circumstances, the evidence does not preponderate against the trial court's award of 25% permanent partial impairment rating to each upper extremity.

## Conclusion

The judgment of the Special Workers' Compensation Appeals Panel is reversed and the judgment of the trial court is reinstated. Costs on appeal are assessed to the appellees, Nissan North America, Inc., and Ace America, TPA, ESIS, Inc., for which execution may issue if necessary.

_____
SHARON G. LEE, JUSTICE