# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### January 5, 2012 Session

## ROGER DALE WILLIAMSON v. BAPTIST HOSPITAL OF COCKE COUNTY, INC.

**Appeal by Permission from the Special Workers' Compensation Appeals Panel**
**Circuit Court for Cocke County**
**No. 31625I     Ben W. Hooper, II, Judge**

---

### No. E2010-01282-SC-WCM-WC - Filed February 28, 2012

---

The employee, a certified nursing assistant, sustained an injury to his shoulder while moving a patient. Six months later, the employee returned to work with significant restrictions on the use of his right arm. After two weeks of on-the-job training as a phlebotomist, which offered a higher pay grade, the employee notified the employer of his resignation, believing that he would be unable to handle the duties associated with his new position. When he made a claim for workers' compensation benefits, the trial court, accrediting the testimony of the employee, held that he did not have a meaningful return to work and applied a multiplier of six to the assigned impairment rating. A special workers' compensation panel reversed, concluding that the evidence preponderated against the trial court's ruling that the employee had not made a meaningful return to work and reducing the award to one-and-one-half times the impairment rating. Because the evidence demonstrates that the employee did have a meaningful return to work, the judgment of the panel is affirmed.

**Tenn. Code Ann. § 50-6-225(e) Appeal as of Right; Judgment of the Panel Affirmed**

GARY R. WADE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined. JANICE M. HOLDER, J., not participating.

James M. Davis, Morristown, Tennessee, for the appellant, Roger Dale Williamson.

Reuben N. Pelot, IV, Knoxville, Tennessee, for the appellee, Baptist Hospital of Cocke County, Inc.

## OPINION
### Factual and Procedural History

In September of 1998, Baptist Hospital of Cocke County, Inc. (the "Employer") hired Roger Dale Williamson (the "Employee") as a certified nursing assistant ("CNA"). After almost ten years of service, on May 16, 2008, the Employee suffered a rotator cuff tear to his right shoulder while attempting to move a patient. After reporting the injury, the Employee was referred to Dr. James Williams. Dr. Williams first ordered magnetic resonance imaging ("MRI") and then referred the Employee to Dr. William Hovis, an orthopedic surgeon. On June 11, 2008, Dr. Hovis performed surgery to repair the tear. He released the Employee to return to work in October of 2008. Because the nature of his injury precluded the Employee from continuing as a CNA, the Employer offered him a position as a phlebotomist[1] at an increased rate of pay. Because the Employee had no prior experience as a phlebotomist, he received on-the-job training under supervision. After two weeks of training, he resigned effective December 1, 2008.

On May 12, 2009, the Employee filed a suit for workers' compensation benefits. Fifty-nine years old at the time of trial, the Employee claimed a permanent partial disability to the body as a whole and further asserted that he had been denied a meaningful return to work. He testified that after he had completed high school, he was a factory worker for Stokely-Van Camp for almost fifteen years and worked for Verco Manufacturing for eight and one-half years. The Employee stated that he then took a position with Jefferson City Health and Rehab, where he received his certification as a CNA. After five years of employment there, he accepted a CNA position with the Employer. The Employee, who is left-handed, testified that as a result of the injury to his right shoulder, he was no longer able to hold any of the jobs he had held previously and could no longer perform many of his outside chores or other activities. He further contended that he was unable to perform his job as a phlebotomist, explaining that he found it particularly stressful to draw blood from newborns, infants, and children, and pointing out that during the two weeks of his training, he had "missed a lot of veins and had to ask for assistance." The Employee claimed that during this period, he was overwhelmed by fear of being unable to perform competently the requirements of a phlebotomist. He also stated that he "knew in the emergency room [] the combative type of [patients] . . . there . . . and

---

[1] A phlebotomist is "one that practices phlebotomy," defined as "the letting of blood in the treatment of disease." Webster's Third New International Dictionary 1698 (1993).

what could happen to this arm again and . . . the stress just got to me[, and I e]motionally broke down." The Employee further complained that computer work was required and that he could not "do computers," even though his trainer had given him a "cheat sheet to go by." The Employee also noted that the job description required "exerting up to 20 pounds of force occasionally, and/or 10 pounds of force frequently," which he insisted he could not do, even though Dr. Hovis had indicated otherwise.

On cross-examination, the Employee acknowledged that he was able to draw blood from patients early on in his training and that he had been informed by his supervisors that his work was satisfactory. He also acknowledged that his job did not require any overhead lifting or other work that might have exceeded his work restrictions, explaining that he "was not demanded to do anything."

Faye Williamson, the wife of the Employee, also worked for the Employer as a CNA at the time of trial. She stated that the Employee, after his injury, had not been able to do household chores as he had done in the past and that when he returned to work for training as a phlebotomist, he was under stress and had difficulty sleeping. She also testified that since his surgery, he was unable to bowl, an activity he had enjoyed for years, or to fly fish.

Janice Jenkins, a phlebotomist for the Employer with twenty years of experience in the position, had previously been employed as a nursing assistant. She stated that she worked with the Employee for three or four days out of each of the two weeks of his training. She testified that the Employee "did a good job" and performed so capably that she "asked him [if he] had [ever] done it before." She stated that he "caught on drawing blood" faster than many previous trainees. Ms. Jenkins also stated that nothing more than on-the-job training was required for the position and that it was normal for a trainee "to be nervous for the first few months." While Ms. Jenkins agreed that the job required some work with a computer and that it had taken her a short while to "catch on," she could not recall the Employee having made any computer mistakes during the course of his training. Ms. Jenkins testified that the Employee's previous job was far more stressful than the work of a phlebotomist, explaining that a CNA is required to "feed [patients], . . . put them to bed and then . . . get them up for their other meal and . . . put them to bed, and all night long you turn them, you change them, you bathe them. [So i]t's a hard job." She stated that she had never experienced combative patients since becoming a

phlebotomist and that, due to her own physical limitations, she had avoided any overexertion by using a cart rather than carrying a tray. She stated that the heaviest item she was required to lift was less than five pounds, implying that the Employee's work would require nothing more, and also testified that nurses typically held down any combative patients who were in the emergency room, relieving phlebotomists of that responsibility. Ms. Jenkins further testified that, like the Employee, she had no typing skills and was required to "hunt and peck" to enter data on the computer. On cross-examination, Ms. Jenkins acknowledged that the job description contained a provision requiring employees to perform "under pressure or opposition [and] handle stress in ways to maintain relationships with . . . patients, customers, and co-workers." Although she conceded that the Employee appeared to be nervous, she explained that "two weeks would not be time enough . . . to decide if you could do it or not or if the stress would leave."

Gabriel Long, the laboratory manager for the Employer, testified that he had personally observed the Employee's work as a phlebotomist fifty to sixty percent of the time he had trained in that capacity. He recalled that the Employee performed "very well," did a "good job," and was "average to above" in the position. He stated that because the computer system had just been installed at the hospital, it was new to everyone. He confirmed that typing skills were not required. Mr. Long also testified that the job was not physically demanding and did not require overhead lifting, but instead consisted of "[m]ainly just bending over with your knees and hips, tying the tourniquet on and being able to stick a needle in and switch tubes out." He pointed out that other employees were always available to help in the event the Employee or other employees were unable to reach the shelf for items such as gauze, tape, or tourniquets. Mr. Long stated that phlebotomists were not required to restrain combative patients and were trained to wait until a physician had sedated any patient that was resistant to having blood drawn. He testified that he did not detect any nervousness on the part of the Employee during the course of his training. On cross-examination, Mr. Long acknowledged that a phlebotomist would be required to draw blood between fifteen and thirty times per day, and that a policy of the Employer limited each employee in that position to no more than two unsuccessful attempts to draw blood before calling for assistance.

Dr. Hovis, who testified by deposition, determined that the Employee had a 4% permanent partial disability to the body as a whole as a result of the shoulder injury. He stated that the Employee had reached maximum medical improvement by

November 18, 2008, and, as noted, recommended a lifting restriction of twenty pounds. Dr. William Kennedy, an orthopedic surgeon called upon to evaluate the Employee, testified by deposition that as a result of his shoulder injury, the Employee had suffered an 11% anatomical impairment to the body as a whole. Dr. Kennedy recommended no pushing, pulling, or lifting of weights greater than five pounds with his right arm, which, according to Ms. Jenkins, was the maximum that phlebotomists were required to lift.

The trial court, after considering the disability ratings by Dr. Hovis and Dr. Kennedy, chose to assign more weight to Dr. Kennedy's opinion, finding an 11% impairment rating. Further, after determining that the Employee was entitled to "100% credibility that he was not able to do th[e] job," the trial court concluded that, while the issue was particularly difficult, the Employee had been denied a meaningful return to work because the phlebotomist position was beyond his ability based upon his "fear . . . of being injured." The trial court applied a multiplier of six to the 11% impairment rating.

On appeal by the Employer, a Special Workers' Compensation Appeals Panel modified the award to one-and-one-half times the 11% anatomical impairment rating, holding that the evidence preponderated against the ruling of the trial court because (1) the job offered to the Employee was within the limitations of his injury; (2) the Employee was qualified to perform as a phlebotomist based on his prior work history; and (3) the anxiety of the Employee in regard to his ability to perform was without a reasonable foundation. This Court granted the Employee's motion for review in light of our recent holding in Howell v. Nissan North America, Inc., 346 S.W.3d 467 (Tenn. 2011), an opinion filed four months after the Panel ruling in this case.

## Standard of Review

Initially, the trial court's findings of fact are subject to "de novo [review] upon the record . . . accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. Code Ann. § 50-6-225(e)(2) (2008). "This standard of review requires us to examine, in depth, a trial court's factual findings and conclusions." Galloway v. Memphis Drum Serv., 822 S.W.2d 584, 586 (Tenn. 1991). "[W]here medical testimony is presented by deposition, this Court may independently assess the medical proof to determine where the preponderance of the evidence lies." Trosper v. Armstrong Wood Prods., Inc., 273 S.W.3d 598, 604 (Tenn. 2008).

**Development of Applicable Law**

Our first workers' compensation laws, enacted in 1919, were designed to place the burden of compensating injured workers on employers. Lynch v. City of Jellico, 205 S.W.3d 384, 390 (Tenn. 2006); cf. Scott v. Nashville Bridge Co., 223 S.W. 844, 849 (Tenn. 1920) (observing that the purpose of workers' compensation law is "to secure to injured employees reasonable compensation so as to prevent them from becoming public charges"). Because of their remedial nature, Tenn. Code Ann. § 50-6-116 (2008), workers' compensation statutes were construed in a liberal manner so as "'to promote and adhere to the Act's purposes of securing benefits to those workers who fall within its coverage.'" Trosper, 273 S.W.3d at 609 n.5 (quoting Martin v. Lear Corp., 90 S.W.3d 626, 629 (Tenn. 2002)). In 1992, the legislature instituted a cap on permanent partial disability benefits of two-and-one-half times the medical impairment rating for eligible employees who are returned to their employment at a wage equal to or greater than the wage they were receiving at the time of their injury. Workers' Compensation Reform Act of 1992, ch. 900, § 16, 1992 Tenn. Pub. Acts 859, 870 (codified at Tenn. Code Ann. § 50-6-241(a)(1) (1999)).[2] In 2004, the General Assembly overhauled the workers' compensation statutes, see generally Act of May 20, 2004, ch. 962, 2004 Tenn. Pub. Acts 2346, in an effort to reduce the employer's costs of providing coverage. Lynch, 205 S.W.3d at 390. "[T]he legislature recognized that . . . '[i]t is in the best interest of the citizens of Tennessee that such cost savings be passed to the entities that have paid faithfully workers' compensation premiums in order to ensure the economic well-being of their employees.'" Id. (quoting Act of May 20, 2004, ch. 962, § 42(a), 2004 Tenn. Pub. Acts 2346, 2372). The 2004 Act included amendments to the benefits cap for injuries occurring after July 1, 2004, Act of May 20, 2004, ch. 962, § 11, 2004 Tenn. Pub. Acts 2346, 2350-53, reducing the cap on permanent partial disability benefits to one-and-one-half times the impairment rating when an employee has the opportunity to return to his place of employment at the same or a greater wage. Id. at § 11 (codified at Tenn. Code Ann. § 50-6-241(d)(1)(A) (2008 & Supp. 2009)). The cap on permanent partial disability benefits for an injured employee who is not returned to

---

[2] The 1992 Act also added a provision entitling an employee to reconsideration of a disability award "where the employee is no longer employed by the pre-injury employer and makes application to the appropriate court within one (1) year of the employee's loss of employment if such loss of employment is within four hundred (400) weeks of the day the employee returned to work." Id. at § 16 (codified at Tenn. Code Ann. § 50-6-241(a)(2)). The Act lists several factors to be considered in the reconsideration process, "including lay and expert testimony, employee's age, education, skills and training, local job opportunities, and capacity to work at types of employment available in claimant's disabled condition." Id.

work by the employer at a wage equal to or greater than his pre-injury wage is six times the impairment rating, a multiplier unchanged by the 2004 amendments. Tenn. Code Ann. § 50-6-241(d)(2)(A); see Lay v. Scott Cnty. Sheriff's Dep't., 109 S.W.3d 293, 297 (Tenn. 2003). When the employee has made a "meaningful return to work," the lower cap of one-and-one-half times the impairment rating applies. Nichols v. Jack Cooper Transp. Co., 318 S.W.3d 354, 361 (Tenn. 2010).[3]

The meaningful return to work concept provides guidance in the determination of whether the statutory provisions apply to a claim. In Tryon v. Saturn Corp., 254 S.W.3d 321 (Tenn. 2008), this Court made the following observation:

> When determining whether a particular employee had a meaningful return to work, the courts must assess the reasonableness of the employer in attempting to return the employee to work and the reasonableness of the employee in failing to either return to or remain at work. The determination of the reasonableness of the actions of the employer and the employee depends on the facts of each case.
>
> . . . If . . . the employee later retires or resigns for personal reasons or other reasons that are not reasonably related to his or her workplace injury, the employee has had a meaningful return to work which triggers the [lower cap].

Id. at 328-29 (citations omitted). Three factors guide the analysis: (1) whether the injury rendered the employee unable to perform the job; (2) whether the employer refused to accommodate work restrictions "arising from" the injury; and (3) whether the injury caused too much pain to permit the continuation of the work. Id. at 329. "[T]he same standard should be applied to determine whether an employee had a meaningful return to work as part of an initial assessment [or] in a reconsideration case." Id. at 333 n.25; see also Lay, 109 S.W.3d at 298.

---

[3] A meaningful return to work requires an employee not only to return to employment, but also to receive "a wage equal to or greater than the wage [that he] was receiving at the time of the injury." Tenn. Code Ann. § 50-6-241(d)(1)(A); see also Nichols, 318 S.W.3d at 361 n.3 (citing Patton v. Hartco Flooring Co., No. E2008-01829-WC-R3-WC, 2009 WL 3170391, at *6-7 (Tenn. Workers' Comp. Panel Oct. 1, 2009)) (noting that, in Patton, the Panel held that there was not a meaningful return to work when the employee was transferred to a position that paid seventy cents less per hour and the transfer was directly related to her workplace injury).

**Analysis**

In this appeal, the Employee argues that because he was unable—physically or emotionally—to perform as a phlebotomist, he was denied a meaningful return to work by his employer, thereby qualifying him for an award in excess of one-and-one-half times the medical impairment rating. As support for his claim, the Employee cites our recent opinion in Howell, wherein this Court ruled that an employee, who had resigned rather than accepting a different and more demanding position, had been denied a meaningful return to work. 346 S.W.3d at 473. In response, the Employer argues that Howell is not only distinguishable factually, but further demonstrates that when determining whether the return to work was meaningful, the focus must be on the physical ability of the employee to perform the duties of his or her employment.

In Howell, this Court confirmed that the question of whether an employee has had a meaningful return to work requires a fact-intensive analysis. Id. at 472. A female employee, who had carpal tunnel release surgery on both hands, had worked for several years on Nissan's "ZH" production line. Id. at 468-69. She began training to work on the significantly faster "TR" production line, and had also worked three shifts there. Id. at 469. During her training for the TR line, the employee began to feel pain and tingling in both of her hands, experiencing the symptoms which led to her surgical procedures. Id. When the employee was released to return to work, however, Nissan only offered her a position on the faster TR line. Id. at 470. The trial court accredited the employee's testimony as to the conversation she had with her employer in which she stated that she could not physically perform her duties on the faster line. Id. at 471. Although Nissan argued that the employee's anxiety was unfounded, this Court affirmed the trial court's conclusion that the three factors set out in Tryon as applied to the facts of her case were determinative. Id. at 473. That is, the workplace injury resulted in her inability to perform her new job, the employer refused to accommodate her work restrictions, and the injury caused too much pain for the employee to continue. Id. We concluded that the employee "was fully familiar with the demands and requirements of the TR line," that her symptoms had begun after her training on the faster line, and that she had far less time to meet the production number required by Nissan. Id.

In this case, the Employee was offered a return to his place of employment at a greater pay in a position which required only on-the-job training. The undisputed evidence is that the demands upon a CNA, a job the Employee could no longer

perform, were significantly more onerous than those placed upon a phlebotomist.[4] In the new position, the Employer was able to accommodate the restrictions recommended by the physicians who had evaluated the Employee. The Employee, who performed well during his training, quit after only two weeks of training based upon his apprehension that he would be unable to perform, not because he had experienced the onset of pain. His decision to resign was not "based upon any medical advice or opinion." Blair v. Wyndam Vacation Ownership, Inc., E2009-01343-WC-R3-WC, 2010 WL 2943144, at *6 (Tenn. Workers' Comp. Panel July 27, 2010).

In contrast to the facts and circumstances in Howell, a preponderance of the evidence presented at trial established that the doubts, fears, and anxiety of the Employee, while genuine, were unfounded. As recognized by the Panel, the "linchpin" of the trial court's ruling was that the Employee was unable to accept the phlebotomist position because of "his nervousness, his anxiety, his stress." A resignation based upon an unreasonable or otherwise unsubstantiated fear does not qualify as a denial of a meaningful return to work. Dowd v. Cassens Transp. Co., No. M2005-2632-WC-R3-CV, 2007 WL 715518, at *6 (Tenn. Workers' Comp. Panel Mar. 8, 2007). In Dowd, the Panel addressed the objectives of Tennessee Code Annotated section 50-6-241(a)(1):

> The purpose of the statute is to encourage employers to retain injured employees by continuing their employment at their pre-injury rate of pay in exchange for limiting the amount of workers' compensation benefits the employee may recover. In order for the employer to be entitled to the benefit of the statute, it must, according to our case law, offer employment the employee is able to perform and accommodate any work restrictions medically imposed. [The employer] has fulfilled these requirements and is entitled to the benefit the statute.

Id.; see also Robbins v. Graphic Packaging Int'l, Inc., No. M2006-02213-WC-R3-WC, 2007 WL 2458788, at *5-6 (Tenn. Workers' Comp. Panel Aug. 31, 2007).

While mindful of our limited scope of review as to the findings of the trial

---

[4] As a part of the job description, a phlebotomist was required to obtain certification for Basic Life Support. The Employee admitted that he did, in fact, have certifications in both Basic Life Support and Infection Control because they were also required for CNAs.

court, our assessment is that the preponderance of evidence established that the Employer met its statutory obligations. The Employer offered the Employee a meaningful return to work at a pay greater than his previous position and was prepared to accommodate the work restrictions caused by his injury. The Employee was unable to demonstrate that he could not perform the duties of a phlebotomist and failed to establish that he resigned for reasons related to physical pain from his injury. In consequence, he was not denied a meaningful return to work and is limited to an award of one-and-one-half times the medical impairment rating.

## Conclusion

The judgment of the Special Workers' Compensation Appeals Panel modifying the award granted by the trial court is affirmed. Costs are assessed against Roger Dale Williamson and his surety, for which execution may issue if necessary.

_____
GARY R. WADE, JUSTICE
