# IN THE SUPREME COURT OF TENNESSEE
## SPECIAL WORKERS' COMPENSATION APPEALS PANEL
## AT JACKSON
### April 22, 2019 Session

## DEBORAH L. BAIN v. UTI INTEGRATED LOGISTICS LLC, ET AL.

**Appeal from the Circuit Court for Benton County**
**No. 16-CV-11        Charles C. McGinley, Judge**
_____

**No. W2018-00840-SC-WCM-WC – Mailed August 1, 2019; Filed October 16, 2019**
_____

Deborah Bain ("Employee") worked for UTI Integrated Logistics LLC ("Employer") as a shuttle truck driver. She sustained a compensable injury to her right shoulder and right wrist in August 2010 and entered into a settlement agreement with Employer. After returning to work, she suffered an injury to her left shoulder in January 2013. The trial court found that Employee is not permanently and totally disabled, that the 1.5 times cap applies for purposes of both reconsideration of the August 2010 injury and assessment of the January 2013 injury, that she has a 6% medical impairment rating for the January 2013 injury, and that Employer is not responsible for expenses related to treatment she sought on her own. Employee has appealed these rulings. Employer has appealed the trial court's award of further temporary total disability benefits. The appeal has been referred to the Special Workers' Compensation Appeals Panel for a hearing and a report of findings of fact and conclusions of law pursuant to Tennessee Supreme Court Rule 51. We affirm the trial court's judgment.

**Tenn. Code Ann. § 50-6-225(e) (2014) (applicable to injuries occurring prior to July 1, 2014) Appeal as of Right; Judgment of the Circuit Court Affirmed**

WILLIAM B. ACREE, JR., SR.J., delivered the opinion of the court, in which ROGER A. PAGE, J. and ROBERT E. LEE DAVIES, SR.J., joined.

Jeffrey A. Garrety and Charles L. Holliday, Jackson, Tennessee, for the appellant, Deborah Bain.

Alex B. Morrison and Ryan C. Edens, Knoxville, Tennessee, for the appellees, UTI Integrated Logistics LLC and New Hampshire Insurance Company.

Ronald W. McNutt (at trial), Erin Shackelford (brief), and Matthew D. Cloutier (argument), Nashville, Tennessee, for Second Injury Fund.

## OPINION

### Factual and Procedural Background

Employee, age 60 at the time of trial, is a high school graduate whose job history consists primarily of operating sewing machines and driving trucks. Many years ago, she received computer training, completed a paralegal course, and also a tax preparation course. However, her experience in those types of work was minimal. She began working for Employer as a shuttle truck driver in June 2010. Her job hauling trailers for short distances required her to constantly climb in and out of the truck, hook and unhook air lines, crank the trailer's dolly legs up and down, and pull the fifth wheel pin to release the trailer. The job involved repetitive use of her shoulders and wrists.

On August 25, 2010, Employee fell from a truck and injured her right shoulder and right wrist. She underwent surgery but continued to have pain. She went to Dr. Jason Todd Hutchison for an independent medical examination on November 21, 2012. He recommended she avoid heavy lifting, which was defined as greater than 10 pounds more than 20 times in an hour. Upon returning to work on light duty, she took a clerical position in the office. When she resumed her regular job as a shuttle truck driver, Employer accommodated her by providing a truck that was easier for her to operate and recognizing that she worked slower than other drivers. On January 11, 2013, she entered into a settlement agreement with Employer for 19.5% permanent partial disability for the right arm injury, which was equal to 1.5 times a medical impairment rating of 13% to the body as a whole. She agreed to have Dr. Hutchison continue as her authorized treating physician for the August 2010 injury.

On January 23, 2013, Employee injured her left shoulder while attempting to pull the fifth wheel pin to release a trailer. She saw Dr. Hutchison about her left shoulder pain. He ordered an MRI, which was done on September 26, 2013. He diagnosed rotator cuff tendonitis and impingement syndrome, with "probably some partial thickness tearing within it." He placed her at maximum medical improvement on October 16, 2013, and assigned an impairment rating of 1% to the body as a whole for rotator cuff tendonitis. At an office visit on October 3, 2013, Dr. Hutchison told Employee that he did not believe she needed surgery and that her complaints were disproportionate to the findings and MRI. He felt that there was some functional or psychological overlay that was

2

preventing her from getting through this. He told her that he could not help her further.

On February 19, 2014, Dr. Apurva R. Dalal saw Employee, at her attorney's request, for an independent medical examination concerning her January 2013 left shoulder injury.[1] He diagnosed a left shoulder rotator cuff tear involving supraspinatus tendon and "strongly advise[d] her to undergo left shoulder arthroscopy with subacromial decompression possibly with rotator cuff repair and possible distal clavicular excision."

Matthew Nowakowski testified that he was previously the manager for operations with responsibility of safety and quality and training. Mr. Nowakowski said that at some point Employer made the decision that Employee's workers' compensation claim was concluded because Dr. Hutchison said he didn't feel there was anything to do for her and he was not going to see her again.

On May 28, 2014, Employee sought treatment from Dr. Gerald Blake Chandler on her own initiative. In his view, the September 2013 MRI revealed a partial rotator cuff tear with some tendonitis and some AC joint arthritis. He determined that she needed left shoulder surgery.

On July 11, 2014, Employee requested family medical leave because of her surgery and also expressed a desire to sign up for disability. She did not ask that her surgical expenses be paid by workers' compensation insurance. Employee made this request to Angie Harris, manager of the Human Resources Department by a handwritten note.

Dr. Chandler performed the surgery on August 1, 2014. He described the surgery as follows:

> [Y]ou could see the full thickness tear of the rotator cuff with a large bone spur off the tip of the acromion and the hypertrophic changes of the AC joint which were pinching on the rotator cuff where the muscle because tendon, and there was a very thick bursa, so we removed the bursa, we released the coracoacromial ligament. We removed the distal clavicle and the bone spur on the front of the acromion, and then we proceeded to repair the rotator cuff.

---

[1] In February 2012, Dr. Dalal had also performed an independent medical evaluation concerning her August 2010 injury.

Dr. Chandler was not aware that he was treating a work-related injury. (Employee's health insurance paid the medical expenses associated with Dr. Chandler's treatment and surgery.) He testified that had he known there was a workers' compensation injury, he would have ordered a functional capacity examination to determine whether to place permanent restrictions on her. He also told Employee that he thought she would do well in finding a new line of work. He testified that:

> Q. Doctor, did you have an opinion on that day in March of 2015 as to whether or not this lady's need to continue off work was necessary and, secondly, whether or not she would be able to tolerate or return to truck driving?
> A. Yes. I had a discussion with her on that date that I thought it was best for her to continue off work because I didn't think she would be able to tolerate it with her overhead lifting and pushing and pulling of the weights that she had that seemed to keep aggravating her symptoms of pain. And she would get short-term relief from the Cortisone injections but no long-term pain relief, and I told her that I thought she would do well in finding a new line of work.
> Q. Doctor, with regard to your note indicating that she was getting continued aggravation with pushing and pulling and lifting, do you have an opinion – I know you did not send her for an FCE in this case, but do you have an opinion as to what you would recommend in hopes of maintaining the best results from this surgery?
> A. I think that with her symptoms and her range of motion and weakness that she would have difficulty with work above shoulder level. She would have difficulty with pushing or pulling a certain poundage, which an FCE would certainly be beneficial on. But I think there would be a certain limitation there that would cause her difficulty with pushing and pulling of weight.

Dr. Chandler opined that Employee had 10% left upper extremity impairment and 6% whole person impairment. He did not place her at maximum medical improvement, but said if he had, it would have been on May 27, 2015, the date he gave her the impairment rating.

On March 23, 2015, less than a week after her last appointment with Dr. Chandler, Employee submitted a letter of resignation to Employer. The letter was addressed to the attention of Angie Harris, Human Resources and said:

4

I am hereby notifying you that because of the past injury and all of the previous injuries sustained to my body, also the recommendation of my physician, Dr. Blake Chandler, that I can no longer perform the duties of this job. I have no choice but to give my 2 weeks notice effective today March 23, 2015.

Mr. Nowakowski testified that he and Angie Harris were in the office when Employee brought her letter of resignation. The only conversation between them was that Mr. Nowakowski told Employee he could pass the resignation along to the corporate office. Mr. Nowakowski also testified that prior to receiving the letter of resignation, he had received a doctor's report stating that Employee should pursue a different line of work.

With respect to accommodating Employee, Mr. Nowakowski testified:

Q.    Did UTI have any reason to believe that it would not be able to accommodate any additional or change to restrictions by any authorized or unauthorized treating physicians?
A.    No.
Q.    After she – After she claimed her left shoulder injury.
A.    No.
Q.    Was UTI equipped and prepared to provide alternate employment, if necessary, in a different position if they could accommodate the restrictions?
A.    Yes.
Q.    Any additional restrictions that were applied.
A.    Yes.
Q.    To your knowledge, was UTI offered that opportunity to do so?
A.    No.

Employee has not worked for Employer since July 31, 2014, the day before her left shoulder injury. She has made no attempt to find alternate work.

On June 17, 2015, Employee saw Dr. Dalal for a second independent medical examination concerning her left shoulder injury. The surgery had improved her range of motion. He assigned her 7% whole body impairment for the left shoulder injury. He recommended that she avoid work away from her body, overhead work, lifting of more than five pounds with her left hand, and any pushing and pulling.

5

On August 22, 2016, Robert W. Kennon, Ph.D., a vocational expert, evaluated Employee to determine her vocational potential in light of her work-related injuries. Based on Dr. Dalal's "rather severe restrictions," Dr. Kennon concluded that Employee "should be considered 100% vocationally disabled."

Employee testified to the pain she has from both shoulder injuries. She said she is unable to perform basic household functions and to perform the duties she had with Employer. She said she lost her livelihood and all her benefits.

The matters related to reconsideration of the August 2010 injury and assessment of the January 2013 injury were consolidated, and a hearing was held on February 7, 2018. The only witnesses were Employee and Matthew Nowakowski, Employer's representative. Exhibits included the depositions of the medical experts and the report of the vocational expert. In the judgment filed on April 13, 2018, the trial court ruled as follows: (1) Employee is not permanently and totally disabled; (2) because of her voluntary resignation, the 1.5 times cap applies for purposes of both reconsideration of the August 2010 injury and assessment of the January 2013 injury; (3) she has a 6% medical impairment rating for the January 2013 injury; (4) because she sought treatment by Dr. Chandler on her own, Employer is not responsible for those medical expenses and associated charges; and (5) she is entitled to temporary total disability from August 1, 2014 (the date of her left shoulder surgery) through March 23, 2015 (the date of her voluntary resignation).

**Analysis**

*Standard of Review*

"Review of the trial court's findings of fact shall be de novo upon the record of the trial court, accompanied by a presumption of correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. Code Ann. § 50-6-225(e)(2) (2014) (applicable to injuries occurring prior to July 1, 2014). When the trial court has seen and heard the witnesses, considerable deference must be afforded the trial court's credibility and factual determinations. *Tryon v. Saturn Corp.*, 254 S.W.3d 321, 327 (Tenn. 2008). No similar deference need be afforded the trial court's findings based on medical testimony presented by deposition. *Id.* Questions of law are reviewed de novo with no presumption of correctness. *Id.*

6

*Permanent Total Disability*

Employee argues that the trial court erred in failing to find that she is permanently and totally disabled, given Dr. Robert Kennon's unrefuted opinion that she is 100% vocationally disabled. Dr. Kennon's opinion was based upon Dr. Dalal's recommendation that Employee lift no more than five pounds. Employer and the Second Injury Fund argue that the trial court correctly determined, in light of other evidence, that Employee is not permanently and totally disabled.[2]

An employee is permanently and totally disabled when an injury "totally incapacitates the employee from working at an occupation which brings the employee income." Tenn. Code Ann. § 50-6-207(4)(B) (2014) (applicable to injuries occurring prior to July 1, 2014). The determination of permanent total disability is based on a variety of factors to give the court a complete picture of an individual's ability to return to gainful employment. *Hubble v. Dyer Nursing Home*, 188 S.W.3d 525, 535 (Tenn. 2006). These factors include an employee's skills, training, education, age, job opportunities in the surrounding area, and the availability of work suited for an individual with that particular disability. *Id.* at 535-36. The trial court is not bound to accept physicians' opinions regarding the extent of an employee's disability but is entitled to consider all of the evidence to decide the extent of the employee's disability. *Hinson v. Wal-Mart Stores, Inc.*, 654 S.W.2d 675, 677 (Tenn. 1983).

The trial court heard the testimony of Employee and observed her demeanor. The court considered the medical evidence. None of the physicians testified that Employee is permanently and totally disabled. We have independently reviewed the medical testimony and reach the same conclusion. We, like the trial judge, reject the opinion of Dr. Kennon who based his opinion solely upon Dr. Dalal's recommendation. Having reviewed the evidence, we find it does not preponderate against the trial court's finding that Employee is not permanently and totally disabled.

*Meaningful Return to Work*

Employee argues that the trial court erred in finding that the 1.5 times cap applies for purposes of both reconsideration of the August 2010 injury and assessment of the January 2013 injury. Employer argues that the trial court correctly determined that Employee made a meaningful return to work following both injuries and, therefore, her

---

[2] The Second Injury Fund filed its brief solely on this issue and takes no position on the other issues.

award must be capped at 1.5 times the impairment rating.

An award of permanent partial disability benefits is capped at 1.5 times the medical impairment rating when "the pre-injury employer returns the employee to employment at a wage equal to or greater than the wage the employee was receiving at the time of the injury." Tenn. Code Ann. § 50-6-241(d)(1)(A) (2014) (applicable to injuries occurring prior to July 1, 2014). "In making the determinations, the court shall consider all pertinent factors, including lay and expert testimony, the employee's age, education, skills and training, local job opportunities and capacity to work at types of employment available in claimant's disabled condition." *Id.* An employee has not made a meaningful return to work if he or she returns to work but later resigns or retires for reasons reasonably related to his or her workplace injury. *Tryon v. Saturn Corp.*, 254 S.W.3d 321, 328-29 (Tenn. 2008). If, however, the employee later retires or resigns for personal reasons not reasonably related to his or her workplace injury, the employee has made a meaningful return to work which triggers the lower multiplier. *Id.* at 329. "When determining whether a particular employee had a meaningful return to work, the courts must assess the reasonableness of the employer in attempting to return the employee to work and the reasonableness of the employee in failing to either return to or remain at work." *Id.* "The determination of the reasonableness of the actions of the employer and the employee depends on the facts of each case." *Id.*

Under the settlement of the August 2010 injury, Employee retained a right to reconsideration pursuant to Tennessee Code Annotated section 50-6-241(d). An employee is not entitled to reconsideration of a disability award when the loss of employment is due to "[t]he employee's voluntary resignation or retirement; provided, however, that the resignation or retirement does not result from the work-related disability that is the subject of such reconsideration[.]" Tenn. Code Ann. § 50-6-241(d)(1)(B)(iii)(a) (2014) (applicable to injuries occurring prior to July 1, 2014).

As part of an initial assessment or in a reconsideration case, the same standard applies to determine whether an employee has made a meaningful return to work. *Williamson v. Baptist Hosp. of Cocke Cnty.*, 361 S.W.3d 483, 488 (Tenn. 2012) (citing *Tryon*, 254 S.W.3d at 333 n.25). "Three factors guide the analysis: (1) whether the injury rendered the employee unable to perform the job; (2) whether the employer refused to accommodate work restriction 'arising from' the injury; and (3) whether the injury caused too much pain to permit the continuation of work." *Williamson*, 361 S.W.3d at 488 (citing *Tryon*, 254 S.W.3d at 329).

The trial court found that although Employee was a "train wreck as far as medical

8

problems go," her resignation on March 23, 2015, was voluntary. She resigned and as a result she deprived the Employer of the ability to accommodate. Thus, she was subject to the statutory cap of 1.5%.

Employee contends that the trial court erred when it found that an employee has a duty to allow the Employer an opportunity to accommodate. Employer contends it would have accommodated Employee but for her voluntary resignation.

Employee contends she acted reasonably in resigning without requesting accommodation from Employer. She relies upon the misdiagnosis by her treating physician of her rotator cuff injury and his discontinuation of treatment which resulted in the termination of her workers' compensation benefits. She also relies upon the recommendation of Dr. Chandler that she should find a new line of work. Finally, she contends that she suffers constant pain in both arms and shoulders and is not capable of continuing her job duties.

Employer contends that it has accommodated Employer's work restrictions for a prior injury and would have done so for this injury had it had the opportunity.

Although it may be argued that both parties' actions were reasonable, Employee's claim that she did not have a meaningful return to work must fail. Considering the factors in *Williamson,* 361 S.W.3d at 483, the Court finds that although the work related injuries could have caused Employee too much pain to permit the continuation of work and that the injuries, could have rendered her unable to work, Employer did not refuse to accommodate Employee's work restrictions. Thus, the Court finds there was a meaningful return to work and the statutory caps apply.

*Impairment Rating*

Concerning assessment of the January 2013 injury, Employee argues that the trial court should have used Dr. Dalal's 7% impairment rating instead of Dr. Chandler's 6% impairment rating. Employer argues that the trial court did not abuse its discretion in adopting the impairment rating of Dr. Chandler, who had treated Employee's left shoulder from May 28, 2014 through March 18, 2015. Dr. Dalal saw her on one occasion.

In formulating their respective impairment ratings, each doctor consulted the Sixth Edition of the American Medical Association Guides to the Evaluation of Permanent Impairment ("AMA Guides"). Dr. Chandler rated Employee using the diagnostic based

9

impairment for the distal clavicle excision performed by him. In contrast, Dr. Dalal rated Employee on range of motion loss because it resulted in a higher rating. Considering the AMA Guides and the opportunities each doctor had to evaluate Employee, the trial court adopted Dr. Chandler's diagnosis-based impairment rating of 6%. The evidence does not preponderate against this finding.

*Unauthorized Medical Expenses*

Employee argues that the trial court erred in failing to award medical expenses and related charges incurred during her treatment by Dr. Chandler, given its finding that the left shoulder injury was work-related. Employer argues that the trial court did not abuse its discretion in failing to award expenses for unauthorized treatment.

An employer must pay "reasonable and necessary medical expenses for work-related injuries." *Moore v. Town of Collierville*, 124 S.W.3d 93, 99 (Tenn. 2004) (citing Tenn. Code Ann. § 50-6-204(a)(1)). An employee may be liable, however, for medical expense incurred without consulting the employer. *Buchanan v. Mission Ins. Co.*, 713 S.W.2d 654, 658 (Tenn. 1986). If, as in this case, the employee is dissatisfied with the services of a physician provided by the employer, she generally has three options: (1) move the court to appoint a neutral physician; (2) consult with her employer and make other arrangements; or (3) go to a physician of her own choice, without consulting with her employer, and thus be liable for such services. *Id.* (citing *Consolidated Coal Co. v. Pride*, 452 S.W.2d 349, 354 (Tenn. 1970)).

> Whether an employee is justified in seeking additional medical services to be paid by the employer without consulting him depends upon the circumstances of each case.
> Addressing this same issue and holding that employee was not entitled to reimbursement, this [c]ourt stated in Emerson Electric co. v. Forrest, 536 S.W.2d 343, 346 (Tenn. 1976):
> In Procter Gamble Defense Corp. v. West, 203 Tenn. 138, 310 S.W.2d 175 (1958), it was pointed out that "the intent of the statute was for employee to certainly do not less than consult his employer before incurring the expenses called for by that statute if the employee expects the employer to pay for it." And where the employee incurs medical expenses on his own, the employer is not liable for payment of the expenses absent a showing by the employee that he had a reasonable excuse for not consulting with his employer before incurring the expenses.

*Harris v. Kroger Co., Inc.,* 567 S.W.2d 161, 163 (Tenn. 1978)(internal citations omitted).

Dr. Hutchison, Employee's original treating physician, discontinued his treatment concluding there was nothing further he could do for Employee. She then sought medical treatment on her own. The question is not, however, whether Employee was justified in obtaining further medical treatment of her left shoulder, but whether she was justified in obtaining that treatment without consulting Employer, yet expecting Employer to pay for it. Employee asserts that she did consult with Employer when, after being told by Dr. Chandler that she needed left shoulder surgery, she informed her supervisor and the human resources officer that she was going to be absent from work and that Employer needed someone to cover her shift. Employee also contends that she provided written notice on July 11, 2014, a few weeks before the surgery. This handwritten note states simply that she wants to sign up for the Family Medical Leave Act and short-term disability because of the surgery. The evidence does not preponderate against the trial court's finding that, notwithstanding these communications with Employer, Employee chose to seek this additional medical treatment by Dr. Chandler on her own without consulting Employer. Therefore, as the trial court properly determined, she is liable for the cost of the treatment.

*Temporary Total Disability*

The final issue, which is raised by Employer, concerns the trial court's award of temporary total disability benefits from August 1, 2014 (the date of Employee's left shoulder surgery) through March 23, 2015 (the date of Employee's voluntary resignation). In order to establish a prima facie case of entitlement to temporary total disability, an employee must prove: (1) that he or she was totally disabled to work by a compensable injury; (2) that there was a causal connection between the injury and the inability to work; and (3) the duration of that period of disability. *Cleek v. Wal-Mart Stores, Inc.*, 19 S.W.3d 770, 776 (Tenn. 2000) (citing *Simpson v. Satterfield*, 564 S.W.2d 953, 955 (Tenn. 1978)). Temporary total disability benefits are payable until the injured employee is able to return to work or attains maximum recovery, at which time the entitlement to such benefits terminates. *Id.*

Employer argues that the trial court erred in awarding temporary total disability benefits for August 1, 2014 through March 23, 2015, because Dr. Hutchison, her authorized treating physician, placed her at maximum medical improvement on October 16, 2013. Employee argues that the evidence supports the trial court's decision to award this period of temporary total disability benefits, because Dr. Hutchison had mistakenly placed her at maximum medical improvement.

11

The facts of this case are similar to those in *Calhoun v. Quebecor Printing, Inc.*, No. E2001-00839-WC-R3-CV, 2002 WL 31439313 (Tenn. Workers' Comp. Panel Oct. 28, 2002). In that case, the plaintiff continued to work while being treated for a 1997 injury, and in 1998 her authorized treating physician determined that she had reached maximum medical improvement. After seeking treatment from a non-panel physician, the employee left work on May 19, 1999, underwent back surgery on May 27, 1999, and reached maximum medical improvement relative to her surgery on January 5, 2000. In affirming the trial court's award of temporary total benefits for the period of May 19, 1999 through January 5, 2000, the Appeals Panel stated:

> While the surgery was not authorized by the defendant and therefore was not compensable itself, it was not unreasonable for the plaintiff to seek such medical treatment outside the panel. Further, the plaintiff and her doctor would never have felt she needed the surgery had there not been an injury in the course and scope of her employment. As there is such "causal connection" between the original injury and the plaintiff's inability to work between May 19, 1999, and January 5, 2000, the trial court was within its discretion in finding the plaintiff should receive temporary total disability benefits from the defendant for that period of time, and therefore we affirm the trial court's decision on that issue.

*Id.*, 2002 WL 31439313, at *5.

Employee, like the plaintiff in *Calhoun*, sought unauthorized treatment and was awarded temporary total disability for a period that fell after the date of maximum medical improvement assigned by the authorized treating physician. As in *Calhoun*, a causal connection exists between the original injury and Employee's inability to work after the surgery. In *Calhoun*, the temporary total disability benefits terminated when the plaintiff reached maximum medical improvement relative to her surgery. In this case, the trial court properly terminated the temporary total benefits as of the date of Employee's resignation. The evidence supports the trial court's decision to award temporary total disability benefits from the date of the surgery through the date of the resignation.

12

## Conclusion

The judgment of the trial court is affirmed. Costs are taxed to Deborah Bain, for which execution may issue if necessary.

_____
WILLIAM B. ACREE, JR., SENIOR JUDGE

13

# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON

## DEBORAH L. BAIN v. UTI INTEGRATED LOGISTICS LLC ET AL.

### Circuit Court for Benton County
### No. 16-CV-11

_____

### No. W2018-00840-SC-WCM-WC – Filed October 16, 2019

_____


## JUDGMENT ORDER


This case is before the Court upon the motion for review filed by Deborah L. Bain pursuant to Tennessee Code Annotated section 50-6-225(e)(5)(A)(ii), the entire record, including the order of referral to the Special Workers' Compensation Appeals Panel, and the Panel's Opinion setting forth its findings of fact and conclusions of law.

It appears to the Court that the motion for review is not well taken and is, therefore, denied. The Panel's findings of fact and conclusions of law, which are incorporated by reference, are adopted and affirmed. The decision of the Panel is made the judgment of the Court.

Costs are assessed to Deborah L. Bain, for which execution may issue if necessary.

It is so ORDERED.


PER CURIAM

Roger A. Page, J., not participating